# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELICA DAVILA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:13-cv-00070 |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | |
| NORTHERN REGIONAL JOINT | ) | |
| POLICE BOARD, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

Angelica Davila ("Ms. Davila") filed this suit alleging the violation of her rights under the Fourth and Fourteenth Amendments to the United States Constitution, actionable via 42 U.S.C. § 1983 and the authority of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). She alleges that the Northern Regional Joint Police Board, two Northern Regional Joint Police Board officers, a Federal Immigration and Customs Enforcement officer, and the Allegheny County Jail violated her federal constitutional rights in conjunction with a traffic stop which she generally asserts was based on her Hispanic heritage and led to her seizure and custody without probable cause.

Pending before the Court are three (3) Motions to Dismiss for failure to state a claim, the first filed by Defendants Northern Regional Joint Police Board, Patrolman Andrew Bienemann, and Sergeant John Sicilia (collectively, "Local Police Defendants"), (ECF No. 60), the second filed by Defendant Allegheny County, (ECF No. 62), and the third filed by Defendant Special Agent Brianna Tetrault of United States Immigration and Customs Enforcement ("ICE") (ECF No. 66). Each Defendant seeks to have all claims against them dismissed. Having considered

the Plaintiff's Second Amended Complaint ("SAC")[1], ECF No. 55, the Defendants' Motions to Dismiss, ECF Nos. 60, 62, and 66, the respective Briefs in Support of those Motions, ECF Nos. 61, 63, and 68, Plaintiff's Responses, ECF Nos. 70 and 78, Defendants' Reply Briefs, ECF Nos. 73, 81, and Plaintiff's Sur-Reply Brief, ECF No. 76, the Local Police Defendants' Motion is granted in part and denied in part, Allegheny County's Motion is granted, and Special Agent Tetrault's Motion is granted.[2]

## I. BACKGROUND AND FACTS

When considering a Motion to Dismiss filed under Fed. R. Civ. P. 12(b)(6), the Court must accept as true the factual allegations in the Complaint and draw all reasonable inferences in the Plaintiff's favor. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). For the purposes of the disposition of Defendants' Motions to Dismiss, the essential facts, viewed in the light most favorable to the Plaintiff, are as follows.

The Plaintiff is a United States citizen who was born in Mexico.[3] SAC ¶ 13. She legally immigrated to the United States from Mexico with her parents when she was two years old and

---

[1] It is worthwhile noting that the SAC represents Plaintiff's third effort to set forth plausible constitutional claims against each of the Defendants, and in this case, the decisional process benefits from the briefing and argument of highly experienced counsel on all sides of the case. Thus, this case does not invoke the application of our Circuit's very accommodating rules regarding pleading by *pro se* litigants in certain civil rights actions. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108-09 (3d Cir. 2002).

[2] Also before the court is a Motion to Strike paragraphs 128 through 140 of the SAC as immaterial and impertinent, filed by the Local Police Defendants. The Court has considered the parties' moving, opposition, and reply papers, and for the reasons that follow, the Court denies the Local Police Defendants' Motion to Strike.

[3] It appears that at the time of the events in question, Ms. Davila was a United States citizen. A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled: (1) at least one parent of the child is a citizen of the United States, whether by birth or naturalization; (2) the child is under the age of 18 years; (3) the child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence. 8 U.S.C. § 1431(a). Ms. Davila's father is a United States citizen, she moved to the United States when she was two years old, and she became a lawful permanent resident at the age of 16, while still in the custody of her parents. See Sec. Am. Compl. ¶¶ 18, 19, 21-23. Ms. Davila applied for a Certificate of Citizenship evidencing her citizenship on June 9, 2010, and the Certificate was issued to her on December 20, 2011 – approximately a month before the facts in this case occurred. *Id.* ¶ 24. The Certificate states that Ms. Davila became a citizen on April 30, 2001. *Id.*

became a lawful permanent resident at the age of 16. *Id.* ¶¶ 18, 21. She has lived in the Pittsburgh area for five years. *Id.* ¶ 14.

On January 22, 2011, Ms. Davila drove with her friend Joel Garrete ("Mr. Garrete") as a passenger to a Mexican grocery store in Pine Township, Allegheny County, Pennsylvania. *Id.* ¶¶ 28, 30. Around 5:45 p.m., Ms. Davila and Mr. Garrete drove out of the grocery store parking lot onto Perry Highway. *Id.* ¶ 29. Ms. Davila had driven approximately 250 feet on the highway when Defendant Officer Andrew Bienemann ("Officer Bienemann"), who had been sitting in his patrol car in a parking lot adjacent to the Mexican grocery store, pulled Davila over. *Id.* ¶¶ 31-35. Officer Bienemann informed Ms. Davila that he had stopped her because her headlights were off. *Id.* ¶ 36. He then asked Ms. Davila for her driver's license, proof of registration, and insurance. *Id.* ¶ 36. Ms. Davila, a licensed Pennsylvania driver, provided all three. *Id.* ¶¶ 16, 37. Officer Bienemann then asked for identification from Mr. Garrete. *Id.* ¶¶ 39. Since Mr. Garrete did not speak English, Officer Bienemann asked Ms. Davila to act as a translator for him, and she obliged. *Id.* ¶¶ 40-42. As identification, Mr. Garrete gave Officer Bienemann a pay stub showing his address. *Id.* ¶¶ 44-45. Officer Bienemann asked Mr. Garrete whether he was legally present in the United States, and Mr. Garrete replied that he was not. *Id.* ¶¶ 46-47. Officer Bienemann then walked to his patrol car and requested that the police department's dispatcher check the immigration statuses of both Ms. Davila and Mr. Garrete with United States Immigration and Customs Enforcement ("ICE"). *Id.* ¶ 49.

After about twenty minutes, Officer Bienemann returned to Ms. Davila's car and told her and Mr. Garrete that he was waiting for a call back from ICE. *Id.* ¶¶ 54-55. Eventually, Defendant Special Agent Tetrault ("Agent Tetrault") returned Officer Bienemann's call and asked to speak to Ms. Davila. *Id.* ¶ 57. Officer Bienemann gave Ms. Davila his cellular phone,

and she provided Agent Tetrault with her name, date of birth, and country of origin. *Id.* ¶¶ 58-59. She also told Agent Tetrault that she was a lawful permanent resident of the United States. *Id.* ¶ 60.[4] Agent Tetrault asked Ms. Davila to act as a translator for Mr. Garrete, and Ms. Davila agreed. *Id.* ¶¶ 63-64. Agent Tetrault then asked Officer Bienemann to detain Ms. Davila and Mr. Garrete and take them to the Allegheny County Jail "if possible." *Id.* ¶ 67. She instructed Officer Bienemann that she would execute immigration detainers for Ms. Davila and Mr. Garrete and fax them to Officer Bienemann's local police station. *Id.* ¶ 68. Defendant Sergeant John Sicilia ("Sergeant Siclia") then appeared on the scene and, according to Ms. Davila, approved Agent Tetrault's request and asked Ms. Davila and Mr. Garrete to step out of the car. *Id.* ¶¶ 69-70. Sergeant Siclia asked Ms. Davila if there was anyone she could call to pick up her car. *Id.* ¶ 70. Officer Bienemann then handcuffed Ms. Davila and Mr. Garrete, placed them in his patrol car, and transported them to the Northern Regional Police Department station. *Id.* ¶ 71. This occurred approximately two (2) hours after Officer Bienemann initially pulled Ms. Davila's car over. *Id.* ¶ 71.

At the local police station, Ms. Davila asked why she was being held, and was told that ICE had instructed Officer Bienemann to detain her. *Id.* ¶ 73. Ms. Davila advised local police that she was legally present in the United States, worked in Pittsburgh, and had applied for a certificate showing her United States citizenship. *Id.* ¶ 74. She and Mr. Garrete were then held at the police station for approximately fifteen to twenty minutes. *Id.* ¶ 85. Meanwhile, Agent Tetrault signed detainers for Ms. Davila and Mr. Garrete and faxed them to the police station.

---

[4] Agent Tetrault makes much of the fact that Plaintiff did not have with her, and produce, a Permanent Resident Card ("green card"), which would have shown that she was lawfully resident in the United States, as they claim she was legally obligated to do. ECF No. 66, at 11. The record at this point is unclear as to whether she had any such obligations if she was in fact and law a citizen of the United States.

*Id.* ¶ 77. The detainer for Ms. Davila misspelled her last name as Devila-Garcoa.[5] *Id.* ¶ 78. Officer Bienemann then transported Ms. Davila and Mr. Garrete to the Allegheny County Jail ("Jail"), where Ms. Davila was imprisoned on an "immigration hold." *Id.* ¶¶ 86, 97. At the Jail, Ms. Davila's wristband misspelled her name as "Devila-Garcca," and she attempted to inform several guards that the name on her wristband was wrong. *Id.* ¶¶ 101-102.

After taking Ms. Davila and Mr. Garrete to the Jail, Officer Bienemann contacted his local police dispatcher, who told him that ICE Special Agent Jason Kenwood ("Agent Kenwood") wished to speak with him. *Id.* ¶ 87. Agent Kenwood asked Officer Bienemann to view a photo which Kenwood sent to Bienemann on his e-mail and to confirm to Kenwood whether or not the photo was that of Ms. Davila. *Id.* ¶ 88. Officer Bienemann did so and advised Agent Kenwood that the woman in the photo was Ms. Davila. *Id.* ¶¶ 89. Agent Kenwood told Officer Bienemann that a mistake had been made regarding Ms. Davila's identity and that she may have been incorrectly detained. *Id.* ¶ 90. Agent Kenwood stated that he would contact Agent Tetrault and notify her of the error. *Id.* ¶ 91. At 9:50 p.m., Officer Bienemann received confirmation from ICE that Ms. Davila was legally present in the United States. *Id.* ¶ 92. However, he took no steps to have Ms. Davila released from the Jail. *Id.* ¶ 93. At 7:30 a.m. the next morning, Ms. Davila was told that ICE had "changed its mind," and she was released from the Allegheny County Jail. *Id.* ¶ 94, 120.

---

[5] A copy of the detainer can be found at ECF No. 33-1, at 3. Ms. Davila's given name is Angelica Elizabeth Davila Garza, in the Spanish tradition of children being given the last names of both of their parents. SAC ¶ 15. Ms. Davila simply uses "Davila" as her last name for purposes of identification – her Pennsylvania driver's license, Social Security card, and Certificate of Citizenship list her name as Angelica Elizabeth Davila. *Id.* ¶ 16. However, her permanent resident card lists her name as Angelica Elizabeth Davila Garza. *Id.* ¶ 17.

Ms. Davila filed suit in this Court on January 15, 2013 against the above-named Defendants. She uses 42 U.S.C. § 1983 to bring the following claims against the Local Police Defendants in their official and individual capacities and Allegheny County:[6]

1)      Against Officer Bienemann, Ms. Davila asserts two Fourth Amendment "unreasonable seizure" claims, one based on her claim that Officer Bienemann lacked probable cause to detain her, and the other based on her claim that Officer Bienemann caused an unlawful immigration detainer to issue against her. Ms. Davila also brings a Fourteenth Amendment equal protection claim against Officer Bienemann asserting that he detained her based on her Hispanic ethnicity, and Fourth Amendment "unreasonable seizure" and "false imprisonment" claims on the basis that Officer Bienemann unlawfully imprisoned her on an immigration detainer. Finally, Ms. Davila brings a Fourth Amendment "false imprisonment" claim against Officer Bienemann, maintaining that he owed her a duty to inform the Allegheny County Jail that she had been incorrectly detained.

2)      Against Sergeant Sicilia, Ms. Davila brings a Fourth Amendment "unreasonable seizure" claim for approving her transfer to the Allegheny County Jail on the immigration detainer.

3)      Against the Northern Regional Joint Police Board, Ms. Davila asserts two Fourth Amendment "unreasonable seizure" claims, on the basis that both her allegedly unlawful detention and her transfer to the Allegheny County

---

[6] The SAC pleads concurrent *Bivens* claims against the Local Police Defendants and Allegheny County. *Bivens* created a cause of action for violation of constitutional rights against only federal agents or officials acting under federal law. *Bistrian v. Levi*, 696 F.3d 352, 365-66 (3d Cir. 2012). Because neither the Local Police Defendants nor Allegheny County are federal agents or officials or were acting under federal law, the Plaintiff stipulated at oral argument on the Motions to Dismiss that she does not assert any *Bivens* claims against those state Defendants.

Jail resulted from an unconstitutional custom, policy, or practice of the Police Board. Ms. Davila also brings a Fourteenth Amendment equal protection claim against the Police Board, on the basis that she was detained in the first instance because of her Hispanic ethnicity as a result of an unconstitutional custom, policy, or practice of the Police Board.

4) Against Allegheny County, Ms. Davila brings Fourth Amendment "unreasonable seizure" and "false imprisonment" claims, on the basis that the Allegheny County Jail unlawfully imprisoned her on an immigration detainer. She also asserts a Fourth Amendment "false imprisonment" claim against the County, alleging that the County Jail had a duty to release her. Finally, Ms. Davila brings a Fourteenth Amendment due process claim against the County, on the grounds that the County Jail violated her right to due process by imprisoning her on a detainer issued on less than probable cause, failing to give her notice and an opportunity to be heard, and imprisoning her on a facially deficient detainer.

Ms. Davila uses the authority of *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), ("*Bivens*") to bring three Fourth Amendment claims against Agent Tetrault in her official and individual capacity as a federal officer.[7] She asserts an "unreasonable seizure" claim on the basis that Agent Tetrault caused an unlawful immigration detainer to issue against her. She also brings "unreasonable seizure" and "false imprisonment" claims, alleging that Agent Tetrault caused her to be wrongfully

---

[7] The SAC pleads concurrent § 1983 claims against Agent Tetrault. Section 1983 creates a claim for violation of constitutional rights only against a person acting under state law. *Brown v. Philip Morris Inc.*, 250 F.3d 789, 800 (3d Cir. 2001). §Section 1983 liability does not attach for actions taken under color of federal law. *Id.* Because Agent Tetrault was not acting under color of state law, the Plaintiff stipulated at oral argument that she does not assert any § 1983 claims against Agent Tetrault.

imprisoned in the Allegheny County Jail. Finally, Ms. Davila brings a "false imprisonment" claim against Agent Tetrault, stating that she owed a duty to inform the County Jail that Ms. Davila had been incorrectly detained.

## II.     **LEGAL STANDARD (MOTION TO STRIKE)**

Under Fed. R. Civ. P. 12(f), a court may strike from a pleading any redundant, immaterial, impertinent, or scandalous matter. Immaterial matter has no essential or important relationship to the claim for relief. *Conklin v. Anthou*, 2011 WL 1303299, at *1 (M.D. Pa. Apr. 5, 2011). Impertinent matter comprises allegations that do not pertain, and are not necessary, to the issues in question. *In re Shannopin Mining Co.*, 2002 WL 31002883, at *28 (W.D. Pa. Jul. 25, 2002). Rule 12(f) may not serve as an avenue to procure the dismissal of all or part of a Complaint. *Giles v. Phelan, Hallinan & Schmeig, L.L.P.*, 2012 WL 4506294, at *19 (D.N.J. Sept. 28, 2012). Striking some or all of a pleading is considered a drastic remedy to be granted only when required for the purposes of justice. *Adams v. Cnty. of Erie*, 2009 WL 4016636, at *1 (W.D. Pa. Nov. 19, 2009). A Rule 12(f) motion will therefore be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case. *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 284 F.R.D. 238, 243 (E.D. Pa. 2012).

## III.     **DISCUSSION**

The Local Police Defendants move to strike paragraphs 128 through 140 of the SAC. The allegations contained in them concern an alleged pattern of constitutional violations by Northern Regional Joint Police officers. The Plaintiff claims that in 2010 and 2011, Police Board officers contacted ICE eight times to report fifteen persons, including Ms. Davila and Mr.

Garrete, on the suspicion that they were aliens subject to deportation. SAC ¶ 130. According to the SAC, all fifteen of these people were Hispanic. *Id.* ¶ 131. Each instance involved a contact made to ICE after a traffic stop, during which Police Board officers asked every person in the vehicle for identification. *Id.* ¶¶ 133-34. The Defendants contend that some of the stops referenced in the SAC occurred after the stop at issue in this case, and therefore cannot be considered in determining whether the Police Board had a custom, practice, or policy of stopping Hispanic drivers and questioning them about their immigration status based on their ethnicity.

The Court is not convinced by the Defendants' argument. In *Beck v. City of Pittsburgh*, the Third Circuit considered, as part of evidence of a policy or custom for purposes of § 1983 municipal liability, an incident that occurred after the core operative facts of the case. 89 F.3d 966, 973-74 (3d Cir. 1996). The Court concluded that the incident could have evidentiary value in considering whether the municipal body in question had a pattern of violating the constitutional rights of individuals. *Id.* at 972. Logically, if Defendants' argument prevailed, the first several victims in any pattern of constitutional violations would never have a remedy under § 1983, as they would not be able to show the pattern that they were the first part of. It follows that all alleged instances of the pattern or practice, whether occurring before or after the incident in question, may be pled to establish the Plaintiff's claim for § 1983 municipal liability. Because these allegations are logically related to the Plaintiff's claim for relief against the Police Board, they pertain to the issues in question, and these assertions in and of themselves do not cause improper prejudice to the Police Board or confusion of the issues, the Defendants' Motion to Strike is denied.

## IV.    LEGAL STANDARD (MOTION TO DISMISS)

To survive a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), a Complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The District Court must accept the Complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In short, a Motion to Dismiss should be granted if a party does not allege facts which could, if established at trial, entitle him to relief. *See Fowler*, 578 F.3d at 211.

## V.    DISCUSSION

Section 1983 provides a vehicle to assert claims for violations of an individual's federal constitutional rights. *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010). When analyzing a § 1983 claim, the court's initial inquiry must focus on two essential elements: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005). Neither the Local Police Defendants nor Allegheny County dispute that the allegations sufficiently assert that they were acting under the color of state law in this case. Therefore, the Court need only consider the second requirement of § 1983 – whether a plausible constitutional violation has been asserted.

In *Bivens*, the Supreme Court recognized an implied private right of action for damages against federal officials who have violated a person's Fourth Amendment rights. 403 U.S. 388, 390-92 (1971). This cause of action is the "federal analog to suits brought against state officials

under…42 U.S.C. § 1983." *Iqbal*, 556 U.S. 662, 675-76 (2009) (quoting *Hartman v. Moore*, 547 U.S. 250, 254, n.2 (2006)). Accordingly, the Court applies the same two-pronged analysis to the Plaintiff's *Bivens* claims against Agent Tetrault. Since Agent Tetrault does not dispute that she was allegedly acting under the authority of federal law, the Court must only consider whether a plausible constitutional violation has been asserted.

Whether a constitutional violation is claimed to have occurred is also a prerequisite for a § 1983 or *Bivens* defendant's assertion of qualified immunity. *Wilson v. Layne*, 526 U.S. 603, 609 ("Although this case involves suits under both § 1983 and *Bivens*, the qualified immunity analysis is identical under either cause of action.") In general, the doctrine of qualified immunity shields government officials from the obligation of defending a claim of civil liability when they perform discretionary functions. *Id.* A government official, such as a police officer, will be entitled to claim qualified immunity from suit unless (1) the officer's conduct violated a constitutional right possessed by the plaintiff and (2) the right was "clearly established" at the time of the officer's allegedly unconstitutional conduct. *Giles v. Kearney*, 571 F.3d 318, 325-26 (3d Cir. 2009). These two steps need not be applied in sequence, and a trial court may exercise its discretion to craft the most effective analysis given the circumstances of a particular case. *Pearson v. Callahan*, 555 U.S. 223, 236, 242 (2009). As explained by a unanimous United States Supreme Court in *Pearson*, "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237. A government official's conduct violates clearly established law when, at the time of the challenged conduct, "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011). Because qualified immunity is not merely a defense to liability, but renders a

defendant completely immune to suit, a court should determine at the earliest possible stage whether a grant of qualified immunity would be proper given the facts of the cases taken in the light most favorable to the plaintiff. *Giles*, 571 F.3d at 325-26.

## A.     Claim Against Sergeant Sicilia

The Plaintiff names Sergeant Sicilia in Count II of the SAC, alleging that by approving Ms. Davila's transfer to the Allegheny County Jail, he committed an unreasonable seizure in violation of the Fourth Amendment. SAC ¶ 174. However, the Plaintiff only mentions Sergeant Sicilia twice in the factual allegations of the SAC. She claims that he approved Agent Tetrault's request for Officer Bienemann to transport her and Mr. Garrete to the Allegheny County Jail, asked her and Mr. Garrete to step out of her car, and asked her whether there was someone she could call to pick up the car. *Id.* ¶¶ 69-70. To impose liability on an individual § 1983 defendant, a plaintiff must show that the defendant either individually participated in the alleged constitutional violation or approved of it. *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005). The SAC does not explain how Sergeant Sicilia approving Officer Bienemann's plan to comply with an ICE agent's request to detain two individuals pursuant to immigration detainers, a request authorized by federal regulation,[8] is a situation where it would be clear to a reasonable officer (Sergeant Sicilia) that his conduct was "supporting" a constitutional violation. Read plausibly, the SAC's allegations would seemingly make Sergeant Sicilia strictly liable for failing to stop Officer Bienemann's efforts in their tracks.

---

[8] *See* 8 C.F.R. § 287.7(a) – "Any authorized immigration officer may at any time issue a Form I-247, Immigration Detainer – Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible…"

Ms. Davila next suggests that Sergeant Sicilia is liable in his supervisory capacity. A supervisor may be personally liable under § 1983 if he "participated in violating the Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Nothing in the SAC indicates that Sergeant Sicilia directed Officer Bienemann to pull Ms. Davila over or contact ICE to investigate her immigration status. At best, he merely arrived at the scene of the traffic stop, did not question a routine detention request from Agent Tetrault, and made arrangements for Ms. Davila's car to be picked up. These alleged actions do not, in the Court's view, rise to the level of participation, direction, or knowledge and acquiescence in the constitutional violations alleged against Officer Bienemann, and certainly not as to any of the other alleged violations which are not connected in any way to Sergeant Sicilia. After twice amending her Complaint, the Plaintiff remains unable to levy any allegations of active participation by Sergeant Sicilia in her detention, or any other bases for personal liability as to him, that plausibly suggest that he committed a constitutional violation. Consequently, Sergeant Sicilia's Motion to Dismiss is granted, and the Plaintiff's claim against him is dismissed with prejudice.[9]

**B.** **Claims Against Officer Bienemann**

The Plaintiff's claims against Officer Bienemann are more extensive and plausible. Ms. Davila does not assert that her initial traffic stop was unlawful. She concedes that because her headlights were off, Officer Bienemann possessed the requisite reasonable, articulable suspicion required under the Fourth Amendment for such a stop. *Illinois v. Wardlow*, 528 U.S. 119, 123

---

[9] In our Circuit, at least in civil rights cases, a district court should not dismiss without affirmatively providing to the Plaintiff leave to amend. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). That rule is not applicable here in light of the fact that the Plaintiff has already amended twice. ECF Nos. 33 and 55. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251-53 (3d Cir. 2007).

(2000). But an initially lawful traffic stop may become unlawful "if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). To further investigate beyond the original purpose of the stop, an officer must develop a reasonable suspicion of criminal activity. *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). While there is no firm time limitation on investigative stops, a stop may become a *de facto* arrest if it can no longer be justified as reasonable. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The Plaintiff argues that her seizure became unreasonable due to the length of time – approximately two hours – that she was detained.

In response, Officer Bienemann contends that he developed a reasonable suspicion of criminal activity based on his communication with Mr. Garrete, which revealed that Mr. Garrete was unlawfully present in the United States.[10] According to the Defendant, it was then reasonable to detain both occupants of the vehicle to ascertain Ms. Davila's knowledge of or role in Mr. Garrete's presence in the country and to determine her immigration status. As support, the Defendant cites to *United States v. Baldonado-Garcia*, 2012 WL 135698 (W.D. Pa. January 17, 2012). In that case, an individual was stopped by a Pennsylvania State Trooper on the Pennsylvania Turnpike for speeding. *Id.* at *1. The trooper detained the individual and his passenger for approximately two hours while he contacted ICE, determined there were sufficient grounds to issue an immigration detainer for the passenger, and transferred the passenger into ICE custody. *Id.* at *1-2. The Court held that such detention lasted a reasonable amount of time in light of the circumstances. *Id.* at *4. According to the Local Police Defendants, this creates a nearly presumptive "two hours is O.K." rule for the permissible length of a roadside detention.

---

[10] Under 8 U.S.C. § 1326, subject to certain enumerated exceptions, it is a crime for any alien who has been denied admission, excluded, deported, or removed from the United States, or has departed the United States while an order of exclusion, deportation, or removal is outstanding, to thereafter enter, attempt to enter, or be found in the United States.

The facts of this case are different from those of that case in several important respects. In *Baldonado-Garcia*, the driver of the seized vehicle produced a Pennsylvania driver's license, his proof of registration, and insurance, just as Ms. Davila did. *Id.* at *1. However, ICE was never contacted about the driver after he produced such identification. *Id.* The State Police Communications Center only proceeded to investigate the immigration status of the passenger, who provided a Mexico Consular identification card, but admitted he had no work authorization and was non-responsive to questions about the validity of his presence in this country. *Id.* As a result, the *Baldonado-Garcia* court never had to weigh the impact of the reasonableness analysis of contacting ICE to investigate the immigration status of an individual who supplied proper identification. Additionally, in *Baldonado-Garcia*, the two-hour detention included the traffic stop, contact with ICE, transit back to the State Police Barracks to obtain the immigration detainer, and transferal of the defendant passenger into ICE custody. *Id.* at *4.

In contrast, Ms. Davila was detained at the side of the road for a full two hours, then detained for approximately another hour as she was taken to the local police station and then the Allegheny County Jail. In *Baldonado-Garcia*, the driver was issued a citation for the initial traffic offense. *Id.* According to the SAC, Officer Bienemann never issued such a citation to the Plaintiff. Further, here, the Plaintiff was abundantly cooperative, and everything she said and did ran counter to the conduct of the defendant in *Baldonado-Garcia*. These important distinctions demonstrate the necessity, in determining whether there was a basis for reasonable suspicion and whether a traffic stop detention has morphed into an arrest, of considering the totality of the circumstances of each case. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The Court cannot determine at this early point in the proceedings whether an investigatory stop which leads to no traffic charges and then becomes to a two-hour back-and-forth in a roadside parking lot

was objectively reasonable and/or had not become an "arrest," and the SAC pleads enough facts to suggest that the stop may well have become an unreasonable seizure.

Based on the factual allegations in the SAC, this Court cannot at this point conclude that Officer Bienemann's investigatory stop of Ms. Davila did not become an arrest. At the time of an arrest, a police officer must possess probable cause – reasonably trustworthy information or circumstances within the officer's knowledge, sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). If Officer Bienemann did not have probable cause at the time he arrested Ms. Davila (at the point the "arrest" occurred), he committed an unreasonable seizure in violation of her Fourth Amendment rights. Because the SAC raises plausible questions of fact as to if, and if so when, the investigative stop of Ms. Davila became an "arrest," and whether at that moment probable cause existed for the arrest, the Plaintiff's unreasonable seizure claims against Officer Bienemann survive the Defendant's Motion to Dismiss.

The Plaintiff also avers that Officer Bienemann engaged in selective enforcement, or "racial profiling," in investigating her immigration status during a routine traffic stop. Selective enforcement is a violation of the Equal Protection Clause of the Fourteenth Amendment. *Whren v. United States*, 517 U.S. 806, 813 (1996). To make a viable equal protection claim based on selective enforcement, the Complaint must plausibly suggest that the challenged law enforcement practice had a discriminatory effect and was motivated by a discriminatory purpose. *Carrasca v. Pomeroy*, 313 F.3d 828, 834 (3d Cir. 2002). In pleading discriminatory effect, the Complaint must contain sufficient facts supporting a reasonable inference that the Plaintiff was a member of a protected class, and that similarly situated persons in an unprotected class were treated differently. *Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002). The Plaintiff is

not required to identify specific instances where others have been treated differently, particularly where, as here, the Plaintiff pleads additional facts supportive of the plausible conclusion that there is a custom, practice or policy of differential treatment in operation. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 244-45 (3d Cir. 2008) (referencing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000)).[11] To properly claim a discriminatory purpose, a plaintiff must plead sufficient factual matter to permit a reasonable inference that the defendant acted "for the purpose of discriminating on account of race," ethnicity, or national origin. *Iqbal*, 556 U.S. at 663. A discriminatory purpose implies that the officer took action "at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985).

Officer Bienemann acknowledges Ms. Davila's Hispanic ethnicity. ECF No. 61, at 14. Ms. Davila has also made a general allegation that, in investigating her immigration status, Officer Bienemann treated her differently than he would have treated a non-Hispanic person. SAC ¶¶ 179-183. She supports this allegation with statistics showing that in 2010 and 2011, Northern Regional Joint Police Board officers contacted ICE eight times pursuant to traffic stops to report fifteen people, all of whom were Hispanic, as suspected unlawfully present aliens. SAC ¶¶ 130-31, 133. According to the SAC, Officer Bienemann was involved in three of the eight traffic stops. *Id.* ¶ 132. Ms. Davila has satisfied her baseline pleading requirements for

---

[11] It is worth noting that the Second Circuit case on which *Phillips* relied in holding that an equal protection plaintiff is not required to identify actual instances of different treatment by similarly situated individuals at the pleading stage (*DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir. 2003)) has been superseded by *Ruston v. Skaneateles Town Bd.*, 610 F.3d 55 (2d Cir. 2010). *See Myers v. Shaffer*, 2012 WL 3614614, at *12 n.7 (W.D. Pa. Aug. 21, 2012). In *Ruston*, the Second Circuit held that a general allegation of differential treatment was insufficient under the *Iqbal* pleading standard. However, our Circuit has not yet addressed this issue, and *Phillips* currently remains good law. Our Circuit's previous interpretation of the Supreme Court's "class of one" equal protection pleading theory (announced in *Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)), was articulated in *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). *Hill* required an equal protection plaintiff to allege the existence of similarly situated individuals who were treated differently by the defendant, which the SAC does. *Id.* The SAC identifies thirteen other persons who, over the course of 2010 and 2011, it alleges were treated differently by Police Board officers in contacting ICE on the basis of their Hispanic ethnicity.

discriminatory effect. When stopped, Ms. Davila provided proper identification in the form of a Pennsylvania driver's license, proof of registration, and insurance. While her passenger admitted to being unlawfully present in the United States, it appears that Officer Bienemann had little (if any) legitimate reason, based solely on his request for identification and his questioning of Mr. Garrete, to suspect that Ms. Davila was also unlawfully present.[12] On these facts, at this stage of the case, the Court concludes that a reasonable inference can be drawn that Officer Bienemann acted with a discriminatory purpose in investigating Ms. Davila's immigration status at least in part because of her ethnicity.[13] Therefore, the Plaintiff has stated a viable Equal Protection claim against Officer Bienemann.

The Plaintiff asserts another claim against Officer Bienemann under the Fourth Amendment for false imprisonment, suggesting that once he learned from ICE Agent Kenwood that Ms. Davila was incorrectly detained, he had a duty to inform the Allegheny County Jail of the situation, since among other things, he was the person who delivered her there and secured her in custody. He responds that he simply had no constitutional obligation to do so. Several courts of appeal have held that an officer's failure to release an individual after the officer knew or should have known that the person was wrongfully detained gives rise to a cause of action under § 1983. See *Thompson v. Olson*, 798 F.2d 552, 556 (1st Cir. 1986) (In the context of a § 1983 false imprisonment claim, following a legal warrantless arrest based on probable cause, an

---

[12] The Tenth Circuit has rejected the premise that once someone is identified by authorities as unlawfully present in the United States, anyone providing him with transportation for daily activities is also reasonably suspected of criminal activity. *See United States v. De La Cruz*, 703 F.3d 1193, 1199 (10th Cir. 2013) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 875-76 (1975)).

[13] The SAC also pleads that the ball got rolling on Officer Bienemann's traffic stop when he elected to monitor traffic activity while parked in a lot next to a grocery store focused on Mexican food. SAC ¶¶ 28-32. If, and if so how, that fact connects to his and his Department's statistics regarding traffic stops (and ICE contacts) relative to Hispanic and non-Hispanic drivers has yet to be seen. Absent an ethnicity-neutral law enforcement justification for choosing that particular locale to monitor compliance with our Commonwealth's traffic laws, it may be a fact that makes the Plaintiff's custom and policy allegations all the more plausible.

affirmative duty to release arises when the arresting officer ascertains beyond a reasonable doubt that the probable cause which formed the basis for the arrest is unfounded); *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1563 (11th Cir. 1993) ("Under certain circumstances, however, detention on the basis of misidentification may present a viable § 1983 claim"); *Sivard v. Pulaski Cnty.*, 959 F.2d 662, 668 (7th Cir. 1992) (Defendants' admission that plaintiff was held in prison without charge for 17 days established potential § 1983 liability); *Duckett v. City of Cedar Park*, 950 F.2d 272, 279 (5th Cir. 1992) (Plaintiff may state a constitutional claim if, after officers make an arrest pursuant to a warrant, they fail to release the arrestee after they receive information upon which to conclude beyond a reasonable doubt that the warrant was withdrawn).

While Officer Bienemann had no authority to unilaterally release Ms. Davila once she was in the custody of the Allegheny County Jail, the Fifth Circuit has held that an arresting officer who failed to disclose credible exculpatory evidence, resulting in the plaintiff's continued confinement, could be held liable under § 1983. *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992). The court noted, "It is no answer that [the officer] could not have terminated the proceedings unilaterally once the wheels of the criminal justice system were already in motion." *Id.* Other courts of appeal have echoed this sentiment.[14]

The Third Circuit's opinion in *Schneyder v. Smith* is also instructive on this point. There, a prosecutor secured a warrant of arrest for a material witness in a homicide prosecution. 653 F.3d 313, 316-318 (3d Cir. 2011). The prosecutor failed to inform the issuing judge of a four-month continuance in the trial, resulting in the witness being incarcerated for another 54 days for no reason. *Id.* Our court of appeals held that the prosecutor's conduct, and lack of action, was

---

[14] *See Goodwin v. Metts*, 885 F.2d 157, 162-63 (4th Cir. 1989), *overruled in part by Albright v. Oliver*, 510 U.S. 266 (1994) (Officer could not "escape liability merely because he could not unilaterally have terminated the prosecution."); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him.")

sufficient to establish a *prima facie* violation of the witness's Fourth Amendment rights. *Id.* at 319-21. It is therefore apparent that in our Circuit, a plaintiff may make out a viable false imprisonment claim against a state official who fails to disclose exculpatory information which results in a wrongfully prolonged confinement of the plaintiff.

According to the SAC, Officer Bienemann learned only about an hour after he transported Ms. Davila to the Jail that ICE had made a mistake about her identity, and that she was lawfully present in the United States and should not be held. Despite having just personally detained and transported Ms. Davila to the Jail, Officer Bienemann never reported this information to the Jail, or to anyone else, and Ms. Davila remained incarcerated until the following morning. The fact that Agent Kenwood told Officer Bienemann that he (Agent Kenwood) would tell Agent Tetrault of this turn of events is of no moment, as it was Officer Bienemann who had delivered Ms. Davila up to the Jail, and was plausibly in the best position to cause her release. The case law makes it plain that a police officer in the position that the SAC alleges Officer Bienemann was in cannot avoid liability by invoking the equivalent of an "it's not my job" defense, particularly when no one claims that Agent Kenwood told Officer Bienemann that he (Kenwood) would cause ICE to contact the Jail and seek the Plaintiff's release.[15] Upon these asserted facts, the Court concludes that Ms. Davila has raised a plausible claim against Officer Bienemann for violation of these Fourth Amendment rights.[16]

---

[15] Under Officer Bienemann's theory, if he personally knew that a judicial warrant was to be withdrawn right after he had delivered a person to the Jail, he had no obligation to do anything to communicate that to the Jail officials, or do anything to reverse the custody. The cases cited hold to the contrary. Further, there is nothing in the record revealing whether the Jail could have, without more, acted relative to the Plaintiff's custody solely on the say-so of ICE given that it was Officer Bienemann who had delivered her into custody there.

[16] Defendants appear to assert that Ms. Davila's wrongfully spending overnight in the Jail after it was determined conclusively that there was no basis for her doing so was really not a big deal, and by definition could not be a compensable constitutional wrong. ECF No. 61, at 17-18. The Court disagrees on both counts.

Officer Bienemann next asserts that the Plaintiff's claims are barred because he is entitled to qualified immunity. The SAC satisfactorily suggests Officer Bienemann violated Ms. Davila's Fourth Amendment rights to be free from unreasonable seizure and false imprisonment, as well as her right to equal protection under the law. Therefore, the first prong of the qualified immunity analysis – whether the officer's conduct arguable violated the Plaintiff's constitutional rights – is settled for purposes of the Motion to Dismiss. In satisfaction of the second prong, all of these rights are well established. For purposes of whether a right is established, the question is whether the state of the law at the time gave the officer fair warning that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Fourth Amendment jurisprudence has long demonstrated that an investigative stop must be temporary and last no longer than necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). It is well settled that an arrest requires probable cause, supported either by a warrant or by the circumstances at hand. *Wong Sun v. United States*, 371 U.S. 471, 479-80 (1963). Likewise, no ambiguity exists in the law that selective enforcement based on a person's membership in a particular ethnic group is a violation of the Equal Protection Clause. *Wayte*, 470 U.S. at 608-09. Any reasonable police officer would know that conduct violating these rights is unlawful. *See Al-Kidd*, 131 S.Ct. at 2083. Accordingly, because the SAC contains sufficient allegations to support plausible claims for violations of well-established constitutional rights, Officer Bienemann is not entitled to qualified immunity, and his Motion to Dismiss on that basis is denied.

Officer Bienemann also moves to dismiss all punitive damage claims against him. Punitive damages may be awarded in a § 1983 action where the defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the

federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). A § 1983 plaintiff may establish reckless indifference by showing that the defendant knew he was acting in violation of federal law. *Alexander v. Riga*, 208 F.3d 419, 431 (3d Cir. 2000). Officer Bienemann's only asserted justification for dismissal of the punitive damages claims against him is that "[The Defendant's] conduct at all times material hereto, was not only objectionably [sic] reasonable but, did not rise to the level necessary for the imposition of punitive damages." ECF No. 61, at 22. At this stage, given the factual issues yet to be resolved as to whether Officer Bienemann knew that his alleged conduct violated the Plaintiff's constitutional rights, the Court at this point cannot conclude that such claims are facially implausible, and therefore will not, at this point, dismiss the punitive damages claims against him.

C.     **Claims Against the Northern Regional Joint Police Board**

The Plaintiff seeks to hold the Northern Regional Joint Police Board constitutionally liable for her detention and imprisonment. While municipalities and other local government units may be sued directly under § 1983, they cannot be held liable for their employees' actions on a *respondeat superior* theory. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). Rather, the municipal body itself must have supported a violation of constitutional rights. *Id*. at 691-95. This requires a finding that "the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell*). A policy is made when a decisionmaker with final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). A custom is a course of conduct by state officials, not

authorized by law, that is so permanent and well settled as to virtually constitute law. *Id* (citing *Monell*).

At the pleading stage, a claimant asserting § 1983 municipal liability must allege that a policy or custom of the municipal defendant was the "moving force behind the constitutional violation." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 107 (3d Cir. 2002) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)). To be the "moving force," the constitutional violation must result from "deliberate indifference to the constitutional rights of the [municipality's] inhabitants." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)). A plaintiff does not need to identify a specific policy or custom at this juncture. *Carter v. City of Phila.*, 181 F.3d 339, 357-58 (3d Cir. 1999). But the plaintiff must give adequate notice to the municipality for the basis of its claim, or "some specificity as to the custom, policy, or procedure which caused the plaintiff's injuries as opposed to a generic and unspecified reference to a custom, policy, or procedure." *Phillips*, 515 F.3d at 232.

The SAC alleges that the Police Board has a custom or policy of reporting only certain persons suspected of being unlawfully present in the United States to ICE, has never trained its officers to avoid using race or ethnicity as the basis for questioning those they stop about their immigration status, and does use race or ethnicity for such reports. Ms. Davila suggests that because of and in furtherance of this custom or policy, Officer Bienemann questioned her about her immigration status, detained her for two hours, and reported her to ICE because of her ethnicity. The Supreme Court has recognized that "in limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."

- 23 -

*Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011). Municipal liability is much more tenuous where the claim is based on a failure to train, and such a claim will only survive where the failure amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* A § 1983 plaintiff must show a pattern of constitutional violations to establish deliberate indifference. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).

While the Plaintiff may face a high burden at trial, or perhaps at the summary judgment stage, she has pled sufficient plausible facts to establish a claim for municipal liability. She has identified a specific unconstitutional custom or policy that Officer Bienemann allegedly followed, which she pleads was the moving force behind her stop, questioning, and detention. She has also pled a pattern of similar violations, alleging that in 2010 and 2011, Police Board officers contacted ICE eight times to report fifteen people suspected of being subject to deportation following traffic stops, all of whom were Hispanic. She also notes that notwithstanding her immediate production of the driver's identification Officer Bienemann requested, and her substantial service as a *pro bono* interpreter for both Officer Bienemann and Agent Tetrault, Officer Bienemann nonetheless proceeded to hold her at length on the roadside. These are more than conclusory allegations referring to a generic or unspecified custom or policy, and they adequately provide notice to the Police Board of the policy, custom, or practice that Ms. Davila argues caused and extended a violation of her constitutional rights. Therefore, the Police Board's Motion to Dismiss the Plaintiff's municipal liability claims is denied.

## D.    Claims Against Allegheny County

The Plaintiff also brings municipal liability claims against Allegheny County, maintaining that its Jail had a policy or custom of accepting immigration detainers from ICE

- 24 -

without a constitutionally required investigation of the detainees, and with deliberate indifference as to whether the detainers were based upon probable cause. In *Galarza v. Szalczyk*, Judge Gardner of the Eastern District of Pennsylvania held that a local jail's asserted policy of detaining any person who was named in an immigration detainer was "nondiscriminatory and mandated by federal regulations." 2012 WL 1080020, at *2 (E.D. Pa. Mar. 30, 2012). Department of Homeland Security ("DHS") regulations provide that an immigration officer may at any time issue a detainer to any other federal, state, or local law enforcement agency, advising that agency that DHS seeks custody of an alien currently in the custody of that agency. 8 C.F.R. § 287.7(a). The regulations also provide for such agencies to make a temporary detention at the request of DHS:

> (d) Temporary detention at Department request. Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department.

The *Galarza* court interpreted this regulation as a directive that once an ICE detainer has issued, the agency holding the individual must maintain custody for up to 48 hours, with weekends and holidays excluded. 2012 WL 1080020, at *2. The Court is not aware of, nor is the Plaintiff able to cite to, a case that has held a local government entity's decision to rely on and comply with this federal regulation to be unconstitutional on its face, and no basis has been advanced to conclude that it was unconstitutional for the Jail to abide by the immigration detainer issued by ICE here.

The Plaintiff seeks to differentiate her pleading from that in *Galarza* by alleging that it is the Allegheny County Jail's policy not only to detain anyone named in an immigration detainer, but to detain persons named in immigration detainers issued without probable cause. However,

Ms. Davila provides no supporting facts indicating that the Jail has knowingly adhered to such a policy in her case or in other instances, or that it had any plausible basis to call into question the validity of the ICE detainer. Additionally, nothing in the SAC indicates that the Jail knew or should have known that Ms. Davila was being wrongfully detained until ICE instructed the Jail to release her the next morning, and the Jail complied. While probable cause that an individual is an alien not lawfully present in the United States must exist to issue a detainer, *Babula v. INS*, 665 F.2d 293, 298 (3d Cir. 1981), the Plaintiff cites to no authority that places a duty on local jails to independently investigate the adequacy of the probable cause supporting immigration detainers.[17] Accordingly, the Plaintiff's municipal liability claims against Allegheny County are dismissed with prejudice.

**E.** **Claims Against Agent Tetrault**

The Plaintiff claims that Agent Tetrault violated her Fourth Amendment rights by issuing an immigration detainer for her without probable cause, and by failing to personally secure her release from the Allegheny County Jail once ICE Agent Kenwood determined that Ms. Davila should not be detained. Federal immigration officers are authorized by statute to make a warrantless arrest of an alien if they have "reason to believe that the alien so arrested is in the United States in violation of any such law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). The Third Circuit has equated the operative statutory language -- "reason to believe" -- to probable cause. *Babula*, 664 F.2d at 298. Therefore, to make an arrest where no federal arrest warrant has issued, the immigration officer must have probable cause to

---

[17] Any more than the Jail would have had a duty to go behind the facially valid document authorizing detentions in any other case. Under Plaintiff's theory, the Jail would have a duty to independently verify that those issuing an order of detention actually had before them the underlying probable cause necessary to do so.

believe that the alien is unlawfully present in the United States and would likely flee the area before she could obtain a warrant. *Arizona v. United States*, 132 S.Ct. 2492, 2506 (2012). Ms. Davila argues that Agent Tetrault lacked probable cause to support either conclusion.

The SAC references ICE documents showing that Agent Tetrault's immigration status search for Ms. Davila yielded an Alien Registration Number, or A-number.[18] SAC ¶ 79. According to the SAC, the A-number listed Ms. Davila as "family fairness granted," which provides for relief from removal and authorizes a legal permanent resident's spouse or unmarried child to be employed.[19] *Id.* ¶ 81. The SAC avers that the A-number yielded by the ICE search is not that same as the A-number listed on Ms. Davila's permanent resident card. *Id.* That A-number classifies Ms. Davila as an IR-7, which is used for legal permanent residents who are the children of a U.S. citizen. *Id.* Agent Tetrault counters with ICE documents showing a third A-number for Ms. Davila, which listed her as "family fairness denied." ECF No. 66-2, at 7. The documents provided by Agent Tetrault also indicate that initially, the ICE record search on the night in question showed Ms. Davila as being "out of status." *Id.* at 6.

The Plaintiff argues that because the Defendant's documents were not part of the SAC, they cannot be considered by the Court at the Motion to Dismiss stage. When ruling on a Motion to Dismiss, "courts generally consider only the allegations contained in the Complaint, exhibits attached to the Complaint, and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). However, a court may incorporate by reference and "consider an undisputedly authentic document that a defendant attaches as an exhibit to a Motion to Dismiss if the plaintiff's claims are based on that

---

[18] An Alien Registration Number is the number issued by the Department of Homeland Security to an individual when she becomes a lawful permanent resident of the United States or attains other lawful, non-citizen status. 49 C.F.R. § 1570.3.

[19] *See* 8 U.S.C. § 1255a.

document." *Id.* The Court may consider such a document even where the plaintiff does not explicitly allege the contents of the document in the Complaint. *Reginella Const. Co., Ltd. v. Travelers Cas. and Sur. Co. of America*, 2013 WL 2404140, *5 (W.D. Pa., May 31, 2013). This rule prevents a plaintiff with a legally deficient claim from surviving a Motion to Dismiss by neglecting to attach a document upon which its claims rely, especially if they attach some, but not all, of a group of related operative documents. *Id.* Otherwise meritorious Motions to Dismiss may not be dodged by a plaintiff's cagey inclusion of only a subset of facially related documents.

Here, the Court may review the ICE documents attached to Agent Tetrault's Motion to Dismiss, and must do so if it is necessary to consider the entire picture. The Plaintiff cannot rely on certain of plainly related ICE records to substantiate her claim that Agent Tetrault lacked probable cause while seeking to exclude from consideration the rest of the related ICE records which tell a more complete and different story. The documents provided by Agent Tetrault indicate that initially, when she submitted Ms. Davila's information to the ICE "Law Enforcement Support Center" ("LESC") she received a response indicating that Ms. Davila was "out of status." This gave Agent Tetrault a reasonable basis to believe that Ms. Davila was unlawfully present in the United States. The Plaintiff argues that Agent Tetrault lacked probable cause due to the fact that she (the Plaintiff) told Agent Tetrault she was a lawful permanent resident[20] and produced a Pennsylvania driver's license. However, the SAC does not indicate whether Ms. Davila produced or was carrying her lawful permanent resident card, which is required by statute. 8 U.S.C. § 1304(e). The Defendant also points out that there are several situations in which Pennsylvania issues a driver's license to aliens who lack proper immigration

---

[20] Plaintiff cites to no authority for the proposition that Agent Tetrault was unreasonable in not taking Plaintiff's word for it.

status. ECF No. 68, at 11. Accordingly, these facts do not demonstrate that Agent Tetrault lacked probable cause.

Whether Agent Tetrault had probable cause to believe that Ms. Davila would flee before a warrant was obtained is a closer call. The Third Circuit has provided little guidance as to when this prong of probable cause exists. Because immigration officers often make these determinations on the spot, without an opportunity to verify information or conduct a full-scale interview, courts generally defer to their judgment if there is some reasonable basis for the officer's conclusion, *see Contreras v. United States*, 672 F.2d 307, 308 (2d Cir. 1982), and courts have found probable cause to believe an individual was a flight risk in the face of a variety of factual situations during a traffic stop.[21]

It is difficult, from the scant facts in the SAC, to conclusively discern whether Agent Tetrault did or did not have a reasonable basis to conclude that the Plaintiff might be flight risk. Agent Tetrault did not know or ask about Ms. Davila's ties to the Pittsburgh community, nor did Ms. Davila provide any information about such ties. Ms. Davila produced a Pennsylvania driver's license with a Pittsburgh area address to Officer Bienemann, but it is not pled that Agent Tetrault knew any of that. Ms. Davila emphasizes that she agreed to translate for Agent Tetrault, and that Agent Tetrault never indicated to Ms. Davila that her own immigration status was in question. On the other hand, her name had produced a positive hit on an ICE immigration status search, and Agent Tetrault was not present at the scene to assess the situation for herself.

---

[21] *See United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) (INS agent had probable cause to believe defendant was likely to escape where defendant was pulled over pursuant to a traffic stop, had no immigration documents in his possession, produced a Mexican driver's license, and preliminary record checks produced no information); *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982) (INS officer had reason to believe that escape was likely where one alien acknowledged that she had entered the country illegally, and a second alien acknowledge that she was from a foreign country, did not have a claim of lawful status, and attempted to evade custody); *United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975) (INS officers had probable cause to believe defendants were a flight risk where defendants were in a car and highly mobile prior to arrest, traveling an interstate highway following the commission of a felony).

Although it is not certain from the face of the SAC whether Agent Tetrault possessed the requisite probable cause to issue an immigration detainer for Ms. Davila's arrest, the Court nonetheless concludes that she is entitled to qualified immunity for the claims asserted against her. Qualified immunity protects federal officers acting in their capacity who make mistaken judgments, unless the mistake demonstrates plain incompetence or knowing violation of the law. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Such immunity attaches unless every reasonable official would have understood that those actions equated to a constitutional violation. *Al-Kidd*, 131 S.Ct. at 2083.

The facts alleged in the SAC demonstrate that Agent Tetrault could have reasonably believed that all of her actions in issuing an immigration detainer and requesting that the local arresting officer detain Ms. Davila were lawful. Based on the information Agent Tetrault did possess, along with the immediacy with which she was required to decide whether or not to detain Ms. Davila, the Court concludes that her actions in issuing a detainer for Ms. Davila and having Officer Bienemann transport her to the Allegheny County Jail were not so plainly incompetent or knowingly in violation of the law as to forfeit her claim of qualified immunity, particularly since she is entitled to the presumption that in making that decision, she acted in good faith. *Bridge v. United States Parole Comm'n.*, 981 F.2d 97, 106 (3d Cir. 1992). Agent Tetrault may have made a mistake regarding Ms. Davila's identity, but based on the SAC, it was plainly not caused by ineptitude or disregard for the law, but rather by a search result later determined to be inaccurate. Qualified immunity exists to protect federal officers from liability for such not unreasonable mistakes.

Agent Tetrault is also entitled to qualified immunity on the Plaintiff's claim that she violated Ms. Davila's Fourth Amendment rights by failing to secure her faster release from the

Jail. Ms. Davila claims that Agent Tetrault had some information from which actual knowledge could be inferred that indicated that Ms. Davila was lawfully present in the United States, and therefore she had a duty to inform the Allegheny County Jail that Ms. Davila should be released. However, the results of the ICE records search were facially equivocal and she therefore also had information showing "out of status" status. An examination of the applicable ICE regulations also reveals that Agent Tetrault had no responsibility, as the officer who issued the detainer, to review her own determination to issue a detainer or to order a release. Instead, another ICE officer (here, Agent Kenwood) must independently review the warrantless arrest of an alien and determine whether there is *prima facie* evidence that the person was entering, attempting to enter, or present in the United States in violation of an immigration law. 8 C.F.R. § 287.3(a)-(b). The second officer must determine within 48 hours of the arrest whether the alien will be continued in custody or released. 8 C.F.R. § 287.3(d).

Less than two hours after Agent Tetrault issued the detainer for Ms. Davila, Agent Kenwood had conducted that independent review, confirmed Ms. Davila's photo identity with Officer Bienemann, and notified local police that Ms. Davila was lawfully present in the United States. While it is possible that Agent Kenwood may have had a duty to immediately inform the Allegheny County Jail of his findings, the Court finds nothing in the SAC to suggest that Agent Tetrault did anything other than abide by the applicable ICE regulations, or that she even knew of Agent Kenwood's findings and decided to do nothing with them. Because the alleged facts reveal no constitutional violation committed in this respect by Agent Tetrault, the Court applies qualified immunity to the false imprisonment claim. As such, all claims against Agent Tetrault are dismissed with prejudice.

## VI.   **CONCLUSION**

For the reasons stated, the Local Police Defendants' Motion to Strike is denied, and all claims against Defendants Sergeant Sicilia, Allegheny County, and Agent Tetrault are dismissed with prejudice. The claims against Officer Bienemann and the Northern Regional Joint Police Board all survive. An appropriate order will follow.

_____
Mark R. Hornak
United States District Judge

Dated: October 21, 2013

cc:    All counsel of record