## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGELICA DAVILA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:13-cv-00070 |
| | ) |
| NORTHERN REGIONAL JOINT | ) |
| POLICE BOARD, et al., | ) |
| | ) |
| Defendants. | ) |

## **OPINION**

**Mark R. Hornak, Chief United States District Judge**

Angelica Davila ("Ms. Davila") brought this lawsuit alleging violations of her rights under the Fourth and Fourteenth Amendments to the Constitution, made actionable by 42 U.S.C. § 1983. Ms. Davila alleges that Defendant Officer Andrew Bienemann ("Officer Bienemann") unlawfully detained her during a traffic stop when he extended the length of the traffic stop, without reasonable suspicion or probable cause to do so, in order to investigate Ms. Davila's immigration status. Ms. Davila also alleges that this detention violated the Equal Protection Clause of the Fourteenth Amendment as being conducted because of Ms. Davila's Hispanic ethnicity and/or national origin. Ms. Davila further alleges that Officer Bienemann caused her to remain unlawfully jailed overnight after learning that she was legally residing in the United States by failing to notify the Allegheny County Jail (the "ACJ") of her lawful status.

At all times relevant to this case, Officer Bienemann was a patrol police officer employed by the Northern Regional Joint Police Board (the "NRJPB"), another Defendant in this case. (Third Amended Compl. ¶ 6, ECF No. 138). The NRJPB is a local governmental agency that provides police services for the municipalities of Pine, Richland, and Marshall Townships and

-1-

Bradford Woods Borough in Allegheny County, Pennsylvania. (Pl.'s Concise Statement of Material Facts in Supp. of Mot. for Partial Summ. J. ("Pl.'s SMF") ¶¶ 1–2, ECF No. 236). Ms. Davila alleges that the NRJPB's customs, policies, and/or practices resulted in the deprivation of her Fourth and Fourteenth Amendment rights in connection with these incidents.

This case has a long and complicated procedural history. The Court first issued a lengthy opinion addressing the Defendants' motions to dismiss the Second Amended Complaint. *Davila v. N. Reg'l Joint Police Bd.*, 979 F. Supp. 2d 612 (W.D. Pa. 2013) ("*Davila I*"). That Opinion was later vacated in part on further consideration. No. 13-70, 2014 WL 3735631 (W.D. Pa. July 28, 2014) ("*Davila II*"). *Davila II* was itself vacated in part on reconsideration. *Davila v. United States*, 247 F. Supp. 3d 650 (W.D. Pa. 2017) ("*Davila IV*").[1] Officer Bienemann also moved to dismiss the claims in Ms. Davila's Third Amended Complaint against him, which the Court granted in part and denied in part. *Davila v. N. Reg'l Joint Police Bd.*, No. 13-70, 2016 WL 1252986 (W.D. Pa. Mar. 31, 2016) ("*Davila III*").

Now before the Court is Ms. Davila's Motion for Partial Summary Judgment (ECF No. 234), Officer Bienemann's Motion for Summary Judgment (ECF No. 238), and the NRJPB's Motion for Summary Judgment (ECF No. 240). Ms. Davila seeks the entry of summary judgment in her favor and against Officer Bienemann on Counts I and V of the Third Amended Complaint for alleged violations of her Fourth Amendment rights to be free from unreasonable seizures and from false imprisonment. She also seeks the entry of summary judgment in her favor and against the NRJPB on Counts I and II of the Third Amended Complaint for alleged violations of her Fourth Amendment rights to be free from unreasonable seizures. Defendants Officer Bienemann and NRJPB seek the entry of summary judgment in their favor in all claims

[1] The United States is not a defendant in this action. The United States was formerly a defendant in the related action at No. 14-cv-0070, which had been consolidated with this case. (ECF No. 252). The sole remaining defendants here are Officer Bienemann in his individual capacity and the Northern Regional Joint Police Board.

asserted against them. These Motions are fully briefed and ripe for disposition. For the reasons that follow, each Motion will be GRANTED IN PART and DENIED IN PART.

## I.  FACTUAL BACKGROUND

The following facts are undisputed. On January 22, 2011, Angelica Davila drove herself and her friend, Joel Garrete ("Mr. Garrete"), to Los Campos, a Mexican grocery store on U.S. Route 19 in Pine Township, Allegheny County, Pennsylvania. (Defendants' Statement of Material Facts in Supp. of Mot. for Summ. J. ("Defs.' SMF") ¶¶ 36–38, ECF No. 242; *see also* ECF No. 242-8). Ms. Davila and Mr. Garrete arrived at Los Campos sometime between 5:30 p.m. and 6:00 p.m. (Defs.' SMF ¶ 44). As the two left Los Campos, Ms. Davila turned right/north onto U.S. Route 19, a highway with two lanes in each direction. (*Id.* ¶¶ 46–47).

Officer Andrew Bienemann observed Ms. Davila travelling northbound in the left lane of Route 19. (Defs.' SMF ¶ 49). Ms. Davila's vehicle did not have its headlights on. (*Id.* ¶¶ 50, 57). Officer Bienemann thereupon initiated a traffic stop and reported the stop to Allegheny County Dispatch ("ACD") at 6:07 p.m. (*Id.* ¶ 52). Ms. Davila pulled her car over into the parking lot of a nearby restaurant. (*Id.* ¶ 54). Officer Bienemann approached Ms. Davila's vehicle and requested Ms. Davila's driver's license, vehicle registration, and proof of insurance. (*Id.* ¶ 56). Ms. Davila produced a valid and current Pennsylvania driver's license, vehicle registration, and proof of insurance. (Pl.'s SMF ¶ 29). Officer Bienemann also requested identification from Mr. Garrete. (*Id.* ¶ 58).

Mr. Garrete did not speak English, and Ms. Davila interpreted for Mr. Garrete during the traffic stop. (Defs.' SMF ¶¶ 60–61). After Mr. Garrete, through interpretation, answered "no" as to whether he had identification on him, Officer Bienemann asked Ms. Davila to ask Mr. Garrete if he was in the country legally. (Pl.'s SMF ¶¶ 33–34). Through Ms. Davila's interpretation, Mr.

-3-

Garrete answered "no." (*Id.* ¶ 35). Officer Bienemann questioned Mr. Garrete about his immigration status because Mr. Garrete did not speak English and did not have a form of identification on him. (*Id.* ¶ 36). Officer Bienemann then asked Ms. Davila whether she was in the United States legally, and Ms. Davila responded that she was a legal permanent resident. (*Id.* ¶ 41).

Ms. Davila was born in Mexico in 1984 and immigrated to the United States with her parents when she was approximately two years old. (Dep. of Angelica Davila ("Davila Dep.") at 15:25–16:3, 169, 170, ECF No. 237-4). Ms. Davila received derivative United States citizenship pursuant to the Child Citizenship Act of 2000, 8 U.S.C. §§ 1431–33, on April 30, 2001. (Pl.'s SMF ¶ 10). Because she was a citizen, Ms. Davila had no obligation to carry a legal permanent resident card on January 22, 2011, the date of the incident.[2] (*Id.* ¶ 12).

Officer Bienemann then returned to his patrol car and requested a backup unit to assist him. (Deposition of Andrew Bienemann ("Bienemann Dep.") at 62:3–25, ECF No. 237-3). Despite Ms. Davila indicating that she was lawfully present in the United States, and providing facially valid copies of the requested driving and identification documents, Officer Bienemann asked ACD to submit both Ms. Davila's and Mr. Garrete's names to United States Immigration and Customs Enforcement ("ICE") in order to check their immigration statuses. (Pl.'s SMF ¶ 43). Officer Bienemann admitted that, at the time of the request, Ms. Davila had done nothing to cause him to believe that she might not have been lawfully present in the United States. (Bienemann Dep. at 63:17–20). Rather, Officer Bienemann's justification for providing Ms. Davila's name to ICE was that "in the course of [his] years of experience" he had "encountered

---

[2] Apparently unbeknownst to Ms. Davila at the time, she was actually a United States citizen during the entirety of the events giving rise to this suit. Defendants do not dispute that Ms. Davila was an American citizen when she was detained and had been a citizen for about a decade at that time. (Defs.' Resp. SMF ¶ 10, ECF No. 246; *see also* ECF No. 148).

-4-

numerous people who ha[d] not told [him] the truth or had been less than truthful with [him]," and since he was already notifying ICE about Mr. Garrete, he wanted ICE to "run [Ms. Davila's] name as well just to confirm what she had told [him]." (*Id.* at 63:8–16).

A second officer, Officer Sabrina Devereaux, arrived on the scene at approximately 6:13 p.m. (Pl.'s Response to Defs.' Statement of Material Facts ("Pl.'s Resp. SMF") ¶ 68, ECF No. 250). Officer Mark Wolfe responded to the scene at 6:18 p.m. (Deposition of Mark Wolfe ("Wolfe Dep.") at 48:21–49:4, ECF No. 237-5). ACD entered Ms. Davila's and Mr. Garrete's information provided by Officer Bienemann into its system at 6:35 p.m. (Pl.'s Resp. SMF ¶ 73). At approximately 6:36 p.m., Officer Bienemann received confirmation from ACD that Ms. Davila's license, registration, and registration were valid and up to date. (Bienemann Dep. at 119:18–120:1, 121:7–15). ACD did not provide information about Ms. Davila's immigration status at that time. (*Id.*). Sergeant John Sicilia arrived on scene shortly before 6:41 p.m. (Deposition of John Sicilia ("Sicilia Dep.") at 37:23–38:8, ECF No. 237-5). Sergeant Sicilia suggested that all of the cars on the scene at this point (four police cars, and Ms. Davila's) be moved to a vacant parking lot across the street. (*Id.* at 37:23–38:19). Officer Bienemann asked Ms. Davila to move her car to the vacant lot at approximately 6:41 p.m. (Bienemann Dep. at 114:6–13). Officer Bienemann remained roadside with Ms. Davila and Mr. Garrete while awaiting contact with an ICE agent. (*Id.* at 69:24–71:12). Officer Bienemann testified during his deposition that Ms. Davila was not free to leave at any point during the roadside stop. (*Id.* at 86:5–9).

At 6:34 p.m., ICE received an immigration alien query ("IAQ") for Ms. Davila and responded that "this subject is not legally in the United States and appears to be subject to removal proceedings." (ECF No. 242-16). There was no match found in their database for Mr.

Garrete. (ECF No. 242-10). At 6:54 p.m., an individual from ACD contacted the ICE Law Enforcement Support Center ("LESC") regarding Ms. Davila and Mr. Garrete. (ECF No. 242-21). That individual inquired as to how to proceed with Ms. Davila and Mr. Garrete and purported to be speaking with Officer Bienemann, who remained on the scene. (ECF No. 242-20). The individual from ACD advised the individual purported to be Officer Bienemann that "we're going to continue just where you are right now on these two individuals. We found something on the first one. We're still having a hard time on Joel, but we're trying to get a hold of an ICE agent now in the Pittsburgh area, so I'll let you know. Standby." (*Id.*). Call records indicate that ICE Agent Jason Kenwood ("Agent Kenwood") contacted ICE Agent Briana Tetrault ("Agent Tetrault") at 7:04 p.m. (Pl.'s Resp. SMF ¶ 96). Officer Bienemann testified at his deposition that, after learning that Ms. Davila's driver's license was valid, he did not speak with anyone else from ACD until he was connected with Agent Tetrault at 7:22 p.m. (Bienemann Dep. at 69:24–71:6).

Agent Tetrault was patched through to Officer Bienemann at 7:22 p.m.[3] Officer Bienemann informed Agent Tetrault that Mr. Garrete indicated that he was not lawfully present in the United States and that Ms. Davila claimed that she was a legal resident. (Bienemann Dep. at 72:14–25). Agent Tetrault then spoke with Ms. Davila over the phone. (*Id.* at 73:5–12). After speaking with Ms. Davila, Agent Tetrault told Officer Bienemann that Mr. Garrete and Ms. Davila were illegally present in the United States. (*Id.* at 75:19–76:1). Officer Bienemann then asked Agent Tetrault how he should proceed, and Agent Tetrault indicated that ICE was going to

---

[3] Officer Bienemann asserts that the Call Master Record and recording of the phone call indicate that Agent Tetrault was connected to Officer Bienemann at 7:11 p.m. (Defs.' SMF ¶ 97). Upon review of that record, at ECF No. 242-21, there is no indication as to when Agent Tetrault was connected with Officer Bienemann. Ms. Davila presents other evidence that indicates that the call was actually initiated at 7:22 p.m. (ECF No. 242-11 at 3, Bienemann Dep. at 114:19–115:14). It appears to the Court that this fact is not genuinely in dispute, but even if it were, for the purposes of analyzing whether a constitutional violation occurred, this potential eleven-minute discrepancy is not material.

issue detainers for both Mr. Garrete and Ms. Davila. (*Id.* at 76:6–16). Agent Tetrault then asked Officer Bienemann to transport Mr. Garrete and Ms. Davila to the Allegheny County Jail (the "ACJ") for holding. (*Id.* at 77:14–24). Officer Bienemann then handcuffed Mr. Garrete and Ms. Davila and transported them to the Northern Regional Police Station, where he retrieved faxed copies of the ICE detainers. (*Id.* at 79:14–80:3). They arrived at the police station at 8:01 p.m. and remained there for approximately thirty minutes. (*Id.* at 116:8–23). Officer Bienemann then transported Ms. Davila and Mr. Garrete to the ACJ, where they arrived at approximately 8:55 p.m. (*Id.* at 116:24–117:14).

Shortly after leaving the ACJ, Officer Bienemann was contacted by ACD and was alerted that ICE had possibly made an error. (Bienemann Dep. at 91:22–92:6). ACD requested that Officer Bienemann view a photo to confirm whether the photo depicted Ms. Davila. (*Id.*). Officer Bienemann pulled over his vehicle and confirmed that he believed that the photograph was, in fact, a photograph of Ms. Davila. (*Id.* at 92:7–10). Shortly thereafter, Officer Bienemann received a phone call from Agent Kenwood, who told Officer Bienemann that Ms. Davila may have been incorrectly detained due to a mistake. (*Id.* at 92:19–93:13, 135:16–21). Agent Kenwood conveyed to Officer Bienemann that it would be Agent Tetrault's decision on how to proceed if Ms. Davila was incorrectly detained. (*Id.* at 135:22–136:5).

At 9:50 p.m., ICE sent ACD confirmation that Ms. Davila was legally present in the United States as a permanent resident. (Bienemann Dep. at 93:14–19; ECF No. 242-29). Officer Bienemann discussed this information with Sergeant Sicilia, but Officer Bienemann took no additional action to ensure that Ms. Davila was released from custody in part because he believed that "there was nothing within [his] power that [he] could have done to get her out of jail." (Bienemann Dep. at 93:23–95:1).

Later that evening,[4] after Officer Bienemann received word that Ms. Davila was legally residing in the United States, Agent Tetrault faxed an Order to Release Ms. Davila to the Warden of the Allegheny County Jail, along with a copy of Davila's lawful permanent resident card and other proof of legal residence. (ECF No. 242-30). Ms. Davila was not released from the Jail until 7:30 a.m. the next morning. (Davila Dep. at 106:13–25). All told, Angelica Davila, a United States citizen, was detained for over fourteen hours, which included two hours of roadside detention, approximately one hour of transportation to and detention at the local police station, followed by overnight detention at the Allegheny County Jail.

## II. STANDARD FOR REVIEW

A court shall grant summary judgment if the movant shows that there are no genuine disputes of material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment must be granted "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). But, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

---

[4] A copy of the faxed order facially states that it was received at "01/22/2011 23:05", or, 11:05 p.m. on January 22, 2011. (ECF No. 242-30 at 4). Officer Bienemann contends that, because another fax was "an hour off," it is believed that this fax also had a misreported time and was received at 10:05 p.m. (ECF No. 242 at 16 n.3). This is not a material factual dispute. Even if the fax were received at 10:05 p.m., this would still be after Officer Bienemann received information that Ms. Davila was a legal resident and, in any event, Ms. Davila was not released until 7:30 a.m. the next morning.

-8-

The moving party bears the initial burden of demonstrating that there are no genuine disputes of material facts. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362 (3d Cir. 1992) (citing *Celotex*, 477 U.S. at 323). The standard of review is the same on cross-motions for summary judgment—each moving party must independently establish that there are no genuine disputes of material facts. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). If a moving party satisfies this burden, the opposing party must designate specific facts in the record that show that there is a genuine, material factual dispute to be resolved at trial. *Celotex*, 477 U.S. at 324. The non-moving party may rely on its own affidavits or on the "depositions, answers to interrogatories, and admissions on file" to designate these facts, but may not rely solely on its own pleadings. *Id.*; *see also Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). "A fact is "material" if, under the substantive law of the case, it is outcome determinative." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 129 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247–48). Thus, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

## III. DISCUSSION

Plaintiffs may use 42 U.S.C. § 1983 as a vehicle to assert claims for violations of their constitutional rights against persons acting under the color of state law. *See generally Monroe v. Pape*, 365 U.S. 167, 171–72 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978) (holding that municipalities and other local governmental entities may also be held liable as "persons" as the term is used in § 1983). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the

Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Neither party disputes that Officer Bienemann and the NRJPB were acting under color of state law during the events at issue. Thus, in resolving the pending summary judgment motions, the Court must and will focus its analysis on whether the record evidence conclusively establishes that Officer Bienemann and/or the NRJPB did—or did not—violate Ms. Davila's constitutional rights.

Officer Bienemann also argues that, even if his actions may have violated Ms. Davila's constitutional rights, he is nonetheless entitled to qualified immunity and the claims against him should be dismissed on that basis. Qualified immunity is an affirmative defense to § 1983 damages claims available to individuals. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818) (internal quotation marks omitted). Qualified immunity is intended to shield officers who "make reasonable but mistaken judgments about open legal questions" and provide protection for "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). In deciding whether qualified immunity applies, a court must determine whether the facts that the claimant has shown make out a violation of a constitutional right and whether the right at issue was "clearly established" when the alleged violation occurred. *Pearson*, 555 U.S. at 232–33. A court may decide these issues in any order. *Id.* at 236. That is, if the officer demonstrates that the right at issue was not

"clearly established" at the time of the alleged violation, a court need not consider whether a violation of a constitutional right occurred. *Id.*

In order for a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That is, the allegedly violated right must be described at an appropriate level of generality and particularity. *Id.* at 639–40. It is particularly important in the Fourth Amendment context that the right be described with appropriate specificity, due to the fact-intensive nature of purported Fourth Amendment violations. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). There need not be a case with precisely the same facts in order to put an officer on notice that his conduct would violate a constitutional right, but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotations omitted). Courts look first to relevant precedent from the Supreme Court and controlling authority from the regional court of appeals for this guidance. *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016). And, absent controlling authority on point, a right may be "clearly established" if there is a "robust consensus of cases of persuasive authority" that define the right at issue. *Id.* (internal quotations omitted); *see also al-Kidd*, 563 U.S. at 741–42.

## Claims Against Officer Bienemann

### a. Unreasonable Seizure in Violation of the Fourth Amendment

i. Liability

Ms. Davila alleges that her Fourth Amendment rights were violated when Officer Bienemann engaged in an unreasonable seizure during the initial traffic stop. She argues that her continued roadside detention constituted a *de facto* arrest that was unsupported by probable

-11-

cause that she had committed an offense other than the headlight violation. (Pl. Br. in Supp. at 7, ECF No. 235). She argues in the alternative that, even if her detention did not rise to the level of a *de facto* arrest, it was an impermissibly prolonged investigatory seizure that was unsupported by a reasonable suspicion of criminal wrongdoing. *Id.* at 8.

Ms. Davila and Officer Bienemann both agree that nothing was out of the ordinary with how the traffic stop began. Ms. Davila committed a minor traffic violation by driving without her headlights on at dusk. *See* 75 Pa. C.S. § 4302(a). Having witnessed this, Officer Bienemann had probable cause to believe that Ms. Davila had committed a traffic offense and was thus authorized to pull her vehicle over. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Officer Bienemann then asked Ms. Davila and Mr. Garrete their names and requested that Ms. Davila produce her driver's license, vehicle registration, and proof of insurance. All of these inquiries and requests are permissible as part of a routine traffic stop when there is otherwise reasonable suspicion or probable cause to pull the vehicle over. *Delaware v. Prouse*, 440 U.S. 648, 659 (1979); *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984). It was also permissible for Officer Bienemann, as part of this routine stop, to inquire as to both Ms. Davila and Mr. Garrete's immigration status and place of birth. *Muehler v. Mena*, 544 U.S. 93, 100–01 (2005). And finally, it would be reasonable for Officer Bienemann to continue to detain Mr. Garrete while he contacted ICE in order to verify his identity after he failed to produce identification and admitted that he was not in the country legally. *See, e.g.*, *United States v. Baldonado-Garcia*, No. 11-215, 2012 WL 135698, at *3–*4 (W.D. Pa. Jan. 17, 2012) (discussing *United States v. Soriano-Jarquin*, 492 F.3d 495, 500–01 (4th Cir. 2007)). As explained by the Fourth Circuit in *Soriano-Jarquin*, there is a legitimate officer safety rationale for confirming the identities of individuals that are seized during a traffic stop. 492 F.3d at 500–01. Mr. Garrete's responses to

Officer Bienemann's questions put his identity justifiably in doubt, and ICE provides identification services for foreign nationals. *See Arizona*, 567 U.S. at 412. But the parties vehemently disagree about the import of Officer Bienemann's decision to submit Ms. Davila's name to ICE to verify *her* identity and/or immigration status, prolonging the traffic stop as he did so.

Both Ms. Davila and Mr. Garrete were "seized" for the purposes of the Fourth Amendment when Officer Bienemann effected the traffic stop. *Brendlin v. California*, 551 U.S. 249, 255–58 (2007). To be clear, Ms. Davila acknowledges that Officer Bienemann initially had probable cause to stop her vehicle, and this Court has so held. *Davila I*, 979 F. Supp. 2d at 628 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). But, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

If a seizure or detention is extended beyond what was authorized by the initial reasonable suspicion or probable cause, that extended seizure is unconstitutional absent additional reasonable suspicion of criminal activity. *See, e.g.*, *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."). Moreover, as illustrated by *Rodriguez*, there is no *de minimis* exception to this rule. *Id.*; *see also United States v. Bey*, — F.3d —, 2018 WL 6712622 (3d Cir. Dec. 21, 2018) (precedential) (holding that a *Terry* stop should have ended the moment that a suspect turned around and, based on his appearance, the police should have realized that he could not be the suspect they were pursuing). The defendant in *Rodriguez* was pulled over for a minor traffic violation and the police officer on the scene checked the defendant's license, registration, and other records before issuing him a

written warning. *Id.* at 1613. Following the issuance of the warning, the officer asked if he could walk his drug-sniffing dog around the vehicle, and the defendant said no. *Id.* The officer nonetheless retrieved his dog and led him around the vehicle and the dog alerted to the presence of methamphetamine. *Id.* About seven to eight minutes passed after the warning was issued until the dog alerted to the presence of drugs. *Id.* However, because the objective of the traffic stop was already completed (investigating and issuing a warning for the traffic violation) and the dog sniff was not otherwise connected to roadway safety, the Supreme Court concluded that the extension of the traffic stop was unconstitutional. *Id.* at 1615–16.

In this Court's view, the holding in *Rodriguez* was not a revelation—it merely confirmed and exemplified what was clearly established by existing precedent. For instance, *Illinois v. Caballes*, 543 U.S. 405 (2005), though reaching a different result, is perfectly consistent with *Rodriguez* and articulates the same rule. The *Caballes* Court explained that the performance of a dog sniff in connection with an otherwise lawful traffic stop—even if the stop was for a non-investigatory purpose—was not a constitutional violation. 543 U.S. at 408–09. This is so because a dog sniff would "disclose[] only the presence or absence of narcotics," and thus the use of a dog in traffic stops does not implicate legitimate privacy interests. *Id.* (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)). However, important to the *Caballes* Court's conclusion was that "the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries to such a stop." 543 U.S. at 408. That is, the dog sniff in *Caballes* was lawful only because it did not otherwise extend the length of the independently justified traffic stop. The *Caballes* Court also explained that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 407; *see also Arizona v. Johnson*, 555 U.S. 323, 333

-14-

(2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, *so long as* those inquiries do not measurably extend the duration of the stop.") (emphasis added); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) ("[T]he stop and inquiry must be reasonably related in scope to the justification for their initiation."). Moreover, the Supreme Court noted that had the defendant in *Caballes* been unlawfully detained due to a prolonged traffic stop, they could "assume" that a dog sniff during that seizure would be unconstitutional. 543 U.S. at 408. That was precisely the scenario presented by *Rodriguez*.

The Supreme Court's guidance is the same in the context presented by this case—an officer asking questions about immigration status while an individual is seized. *See Muehler*, 544 U.S. at 100–01. In *Muehler*, Ms. Mena was detained while police officers executed a search warrant on her premises. *Id.* at 95. During the search, while Ms. Mena was detained, police officers asked her and others for their name, date of birth, and immigration status. *Id.* at 96. The Court held that there "was no additional seizure within the meaning of the Fourth Amendment" when the officers made these inquiries because there was no evidence "that the detention was prolonged by the questioning." *Id.* at 101. Officer Bienemann cites this case for the proposition that an officer may ask an individual for her "name, date and place of birth, or immigration status" without reasonable suspicion. *See id.* Even if accurate, this rule does not carry the day for Officer Bienemann. *Muehler* makes clear that questioning an individual about her immigration status is not in and of itself a "seizure" nor is any reasonable suspicion required to engage in such questioning, but it does not follow that an individual can be *further* detained in order to be questioned, or for her immigration status to be "verified." In fact, the Court's holding was explicitly conditioned on the immigration status inquiries *not* prolonging Ms. Mena's detention.

*Id.* Ms. Mena was going to be detained for several hours due to the execution of the search warrant. Questioning her about her immigration status was not an independent Fourth Amendment event because the questioning occurred within the confines of the detention already justified by the officer-safety rationale in executing the search warrant. *Id.* at 100; *see also United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005) ("[T]he government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable.").

The initial questioning of Ms. Davila was permissible. It was conducted prior to Officer Bienemann's confirmation of Ms. Davila's identity and was within the scope of the stop for her minor traffic violation. However, it does not follow that Officer Bienemann's remaining actions pass constitutional muster. If Ms. Davila's seizure was extended "in scope and duration" longer than what was necessary to investigate her alleged headlight violation and confirm her identity, it became an independent Fourth Amendment seizure that required independent reasonable suspicion or probable cause to justify. *See Florida v. Royer*, 460 U.S. 491, 500 (1983).

The parties disagree about when and whether the "purpose" of the traffic stop here was completed. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("[W]e have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."). Put differently, the parties disagree as to when the "*Rodriguez* moment" of the stop occurred, *i.e.*, when the stop was extended beyond its initial purpose and when additional reasonable suspicion would be needed to justify an extended seizure. *See United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018). In Ms. Davila's view, the mission of the traffic stop was completed at 6:36 p.m. when Officer Bienemann received confirmation of Ms. Davila's identity through ACD verifying the legitimacy of her documents.

A recent precedential decision from the Third Circuit, *United States v. Clark*, 902 F.3d 404 (3d Cir. 2018), supports this contention. In *Clark*, an officer performed a "routine[]" traffic stop and asked for the driver's license, registration, and proof of insurance. *Id.* at 406. The passenger did not have a copy of his vehicle registration, so the officer ran a records check of the driver which confirmed that the driver was legally authorized to operate the vehicle. *Id.* Regardless, the officer continued to ask the driver questions about his criminal history because he suspected that the driver may have been lying to him. *Id.* at 407. The Third Circuit held that this was impermissible because the records check confirmed that the driver was legally authorized to drive the vehicle and there was no reasonable basis for the officer to doubt that information. *Id.* at 411. In other words, the purpose of the traffic stop was concluded when the records check confirmed the driver's authority to drive the vehicle. *Id.*

Here, had this been a "typical" stop for driving without headlights on, Officer Bienemann would have simply checked Ms. Davila's documents, warned or cited Ms. Davila for the violation, and then allowed her to leave. (Bienemann Dep. at 13:16–15:9). The entire process would have taken ten to twenty minutes. (*Id.* at 27:2–21). Of course, that is not what happened. After going through all of the usual incidents of an ordinary traffic stop, Officer Bienemann extended the seizure as he took the further step of having Ms. Davila's name submitted to ICE without a reasonable suspicion that her identity was in question, or as to her immigration status. (*Id.* at 63:17–20).

Officer Bienemann received confirmation of Ms. Davila's identification documents at 6:36 p.m., (Bienemann Dep. at 119:18–120:1), roughly twenty-nine minutes after the stop began. (*See id.* at 103:17–104:16). At this point, he had no reasonable basis to further doubt Ms. Davila's identity, and the mission of the traffic stop was complete. *See Clark*, 902 F.3d at 411.

Any further extension of the traffic stop to confirm Ms. Davila's identity would be impermissible. *Id.* In the interests of officer safety, Officer Bienemann acted reasonably in taking additional steps to verify Mr. Garrete's identity. *See Soriano-Jarquin*, 492 F.3d at 500–01. Mr. Garrete produced no identification and admitted that he was in the country illegally. Unlike Mr. Garrete, however, Ms. Davila produced identifying documents (driver's license, vehicle registration, and proof of insurance) that appeared to be facially valid, and were confirmed by ACD to be legitimate. (Bienemann Dep. at 53:17–18, 64:10–20; ECF No. 237-3). This fact alone is sufficient to distinguish *Baldonado-Garcia*, which Bienemann cites for a presumptive "two hours is okay" rule for immigration inquiries connected to traffic stops. (Bienemann Br. in Opp. at 8–9, ECF No. 239). In *Baldonado-Garcia*, the "court never had to weigh the impact of the reasonableness analysis of contacting ICE to investigate the immigration status of an individual who supplied proper identification." *Davila I*, 979 F. Supp. 2d at 629. In fact, Officer Bienemann admitted that Ms. Davila *had done nothing* at this point to cause him to believe that she might not be lawfully present in the United States.

> Q.    Was there anything that she said or did that caused you to
>        believe that she might not be lawfully present?
>
> A.    No.

(Bienemann Dep. at 63:17–20). Nonetheless, he submitted her name to ICE because, in his experience, he "ha[d] encountered numerous people who ha[d] not told [him] the truth or had been less than truthful with [him] and since [he] was already notifying ICE for Mr. Garrete," he wanted ICE to confirm what Ms. Davila had told him. (*Id.* at 63:10–16). Aside from Ms. Davila's passenger's admissions and Officer Bienemann's generalized "experience" of having other people lie to him in other situations, there was nothing that would have given Officer Bienemann a remote suggestion—let alone reasonable suspicion—that *Ms. Davila* was not who

she said she was or was in violation of any laws (immigration or otherwise) so as to justify extending the length of *her* detention to run *her* name through ICE. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981) ("Based upon th[e] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."). The Court is mindful that reasonable suspicion determinations must be made in view of the "totality of the circumstances," including the "experience and specialized training" of the detaining officer. *See United States v. Arvizu*, 534 U.S. 266, 273–74 (2002). But this does not mean that Officer Bienemann is given *carte blanche* to check and re-check Ms. Davila's identity or immigration status merely because he has the unfortunate experience of having had other people lie to him in the past. Crediting Officer Bienemann's justification would stretch the guidance in *Arvizu* far beyond the Supreme Court's direction. Doing so would seemingly authorize redundant investigations into anything that a detainee told an officer, regardless of whether there is a basis for the officer to doubt the information. Officer Bienemann's rationale boiled down to "we're checking out Garrete, so we might as well check out Davila, too." There is no legal principle that supports a seizure for that purpose, and plenty that invalidate it.

As previously recognized by this Court, it would be entirely inappropriate for Officer Bienemann to submit Ms. Davila's information to ICE merely because her passenger admitted to being in the United States illegally. *Davila III*, 2016 WL 1252986 at \*3 ("[W]rongdoing by one person does not automatically impute wrongdoing to another—that law is clearly established."); *see also United States v. De La Cruz*, 703 F.3d 1193, 1198 (10th Cir 2013) ("When the agents apprehended [a passenger], they discovered he was illegally in the United States. That is a status crime, which would not necessarily suggest that the driver of the vehicle from which he fled was also involved in criminal activity."). Moreover, "[a]s a general rule, it is not a crime for a

removable alien to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012). "If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Id.* In other words, for Officer Bienemann to justifiably continue to detain Ms. Davila after her identification documents were verified, he would have needed a reasonable suspicion calling into question her identity, or a reasonable suspicion that she had committed some other crime. *See Green*, 897 F.3d at 182–83 ("We now ask whether, at our assumed "*Rodriguez* moment," [the officer] possessed reasonable suspicion of criminal activity."). The record is devoid of any such suggestion. To the contrary, Officer Bienemann acknowledged that Ms. Davila was "[v]ery cooperative" throughout the stop. (Bienemann Dep. at 69:22).

And crucially, throughout this entire period, Ms. Davila was not free to leave:

> Q. Now I am going to back up a little bit. During the course of the roadside stop with Ms. Davila and Mr. Garrete, was Ms. Davila free to leave at any point?
>
> A. No, she wasn't.

(Bienemann Dep. at 86:5–9). Given Officer Bienemann's plain and unqualified admission that Ms. Davila was not free to leave "at any point," no reasonable jury could conclude that Ms. Davila was not "seized" for the purposes of the Fourth Amendment for the entire encounter. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been "seized" within the meaning of the Fourth Amendment if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave."). The Fourth Amendment does not permit a local police officer to prolong an individual's detention in order to run an inquiry of that individual's immigration status,

-20-

particularly when it is based only on the officer's self-reported history of being lied to by other people in other circumstances.

Officer Bienemann argues that the time spent waiting on ICE to run Mr. Garrete's and Ms. Davila's information is not attributable to him, as he was "diligent and prompt" in his efforts and the actions of "third-party law enforcement agencies" (including ICE) were "out of his control." (Bienemann Br. in Supp. at 6, ECF No. 239). The Court has already rejected this argument.

> The Court finds unconvincing Officer Bienemann's argument that the portion of the time of the stop comprised of his waiting for ICE to get back to him should not count against him. Officer Bienemann made the stop himself, posed questions to Ms. Davila's passenger about his immigration status, and then affirmatively contacted ICE about both of the occupants of the vehicle. It is plain that he set the wheels in motion as to all that occurred during those two-plus hours. For purposes of analyzing this issue, he owns them.

*Davila II*, 2014 WL 3735631 at *4 n.4. Officer Bienemann has raised no arguments that would support a departure from this settled law of the case. *See Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). In fact, the more developed record at this stage in the proceedings confirms the Court's earlier conclusion. Officer Bienemann unilaterally decided to contact ICE regarding both passengers despite having no reasonable suspicion as to Ms. Davila's identity or immigration status. He cannot now complain about how long the inquiry took when there he decided on his own, without reasonable justification, to initiate that inquiry in the first place.

The Court is unpersuaded by Officer Bienemann's other arguments in support of his claim that the purpose of the traffic stop had not been completed—which are all essentially variations of the assertion that he still needed to confirm Ms. Davila's identity. The Court noted in its earlier opinion at the Motion to Dismiss stage that it was unclear, and apparently hotly contested, as to precisely when Officer Bienemann learned that Ms. Davila was "out of status." *Davila III*, 2016 WL 1252986 at *3 n.3. Even after further factual development, the Court concludes that this fact is still in dispute, but the Court further concludes that it is not material given the evidence in the record.

The record indicates that ICE received an IAQ for Ms. Davila at 6:34 p.m. that indicated that "the subject is not legally in the United States and appears to be subject to removal proceedings." (ECF No. 242-16). However, it remains uncertain as to when Officer Bienemann *personally* became aware of that information. He stated during his deposition that he learned from Agent Tetrault that Ms. Davila was apparently not legally present in the United States and that he did not learn this information until after 7:22 p.m. (Bienemann Dep. at 121:7–15). Notwithstanding that admission, Officer Bienemann now argues that he was on the 6:54 p.m. phone call with the LESC and that he was instructed during this call, by Agent Kenwood, to hold Ms. Davila and Mr. Garrete while they awaited further instruction from a local ICE agent (apparently in reference to Agent Tetrault). After the Court's review of the recorded call in question,[5] the Court concludes that a reasonable jury could conclude that Officer Bienemann, though not audibly heard during the call, was, in fact, a party to the phone call. The dispatcher

_____

[5] Ms. Davila does not challenge the authenticity of the phone call in question, but does contest Officer Bienemann's assertion that the call was initiated at 6:54 p.m. The audio in the call itself does not mention the time. A call log indicates that the call took place at 6:54 p.m. (ECF No. 242-21). Based on what was discussed in the phone call, *i.e.*, Agent Kenwood discussing his anticipated next steps as contacting Agent Tetrault to apprise her of the situation, it appears that this phone call necessarily must have occurred at some point prior to Agent Tetrault speaking with Officer Bienemann at 7:22 p.m. Ms. Davila does not appear to contest this.

-22-

refers to another caller as "N2283," which is Officer Bienemann's badge number. (ECF 242-20; Defs.' SMF ¶ 4). The dispatcher also instructs "2283" (presumably referring to the same badge number) to "stay on [channel] four for a bit" and later asks "Andy" (in apparent reference to Officer *Andrew* Bienemann) if he is still on the line. (ECF No. 242-20). There is more than sufficient evidence for a jury to conclude that Officer Bienemann was on the line and was aware that LESC had requested a continued detention of Mr. Garrete and Ms. Davila.

But even if this is so, and even when evaluating the facts in the light most favorable to Officer Bienemann, this call did not begin until 6:54 p.m. (at the earliest) and Officer Bienemann was aware at 6:36 p.m. that all of Ms. Davila's driving and identification documents were valid. A review of the phone call recording indicates that the request from LESC to hold Mr. Garrete and Ms. Davila did not occur until approximately eight minutes into the call, *i.e.*, 7:02 p.m. (ECF No. 242-20). Thus, the record is uncontroverted insofar as it establishes that Officer Bienemann took it upon himself for *at least* twenty-six minutes (from 6:36 p.m. until 7:02 p.m.) to continue to detain Ms. Davila without a reasonable suspicion as to her identity or involvement in criminal activity. Further, the Court does not accept Officer Bienemann's argument that the then-pending request by LESC to hold Mr. Garrete and Ms. Davila absolved Officer Bienemann of responsibility for the continued detention. As explained above and in the Court's earlier Opinions, *see Davila II*, 2014 WL 3735631 at \*4 n.4, Officer Bienemann unilaterally decided to initiate an unsupported investigation into Ms. Davila's immigration status. The involvement of another player (ICE) in the situation (a delay arising from that entity's activities) does not mean that Officer Bienemann no longer has to answer for his putting the events in motion, or for his continued detention of Ms. Davila.

-23-

The time at which Officer Bienemann became aware of Ms. Davila's "out of status" designation would be material if Officer Bienemann learned of this information prior to 6:36 p.m., when Officer Bienemann learned from ACD that Ms. Davila's documents had been verified. If this was so, it could lay the basis for a reasonable suspicion of Ms. Davila's identity, notwithstanding the facially valid driver's license she supplied. Rather, even though the record indicates that ICE received the IAQ for Ms. Davila at 6:34 p.m., there is no evidence that *Officer Bienemann* received that information until 7:02 p.m. *at the earliest*. There would therefore have been no reasonable basis to continue detaining Ms. Davila after her documents were verified.

In summary, there is a period of time following the verification of Ms. Davila's documents at 6:36 p.m. for which Officer Bienemann needed an independent reasonable suspicion or probable cause of criminal activity in order to continue detaining Ms. Davila. Whether this period of time ended at 7:02 p.m. (as Officer Bienemann argues) or 7:22 p.m. (as Ms. Davila argues) is not material to the question of whether a constitutional violation occurred. *Rodriguez* demonstrates that *any* prolongation of a traffic stop that is unsupported by reasonable suspicion or probable cause is unconstitutional. 135 S. Ct. at 1612. Our court of appeals also recently emphasized that "[a]n investigative stop must . . . cease once reasonable suspicion dissipates." *Bey*, 2018 WL 6712622 at *5. In *Bey*, the prolonged detention was mere moments. There, officers were pursuing an armed suspect and had viewed a photo of the suspect. The officers came across a man wearing similar clothes as the suspect and then drew their weapons and ordered him to stop. *Id.* at *1–*2. The man then turned around and the police conducted a *Terry* stop and frisk, which produced a weapon. *Id.* In holding that the evidence should have been suppressed, the Third Circuit explained that the man's prolonged seizure—even though it was mere moments—was unconstitutional because the officers would have had no reasonable

suspicion to continue detaining the man once he turned around and it was plain that he did not match the description of the suspect that they were pursuing. *Id.* at *6–*7. Here, any doubts as to Ms. Davila's identity were dispelled once ACD confirmed that her driver's license was valid. Her seizure for the investigation of the headlight violation should have gone on no longer. But as admitted by Officer Bienemann during his deposition, Ms. Davila was not free to leave for the entirety of the encounter. (Bienemann Dep. at 86:5–9). This admission, from the police officer that initiated the stop, is sufficient for the Court to conclude that no reasonable jury could conclude that Ms. Davila was *not* seized at any point during the encounter. But there is additional record evidence to support this conclusion as well. For example, Ms. Davila testified at her deposition that she was denied permission to use the restroom during the stop. (Davila Dep. at 74:6–23). Ms. Davila was also requested to move her vehicle to another location, (Bienemann Dep. at 114:6–13), and the additional police cars that arrived to the scene parked behind her car. (Davila Dep. at 65:23–66:1).

While it is true that Sergeant Sicilia testified at his deposition that Ms. Davila was "free to go" until they had the detention order, (Sicilia Dep. at 80:7–10), this strikes the Court as a conclusory assertion from a non-party in the case that is unsupported by the objective evidence in the record and is contrary to Officer Bienemann's own admission. It does not create a factual dispute as to whether Ms. Davila remained seized for the duration of the encounter. *See Anderson*, 477 U.S. at 252. For all of these reasons, the Court concludes that it is undisputed that Ms. Davila was subjected to an unconstitutionally prolonged roadside seizure by Officer Bienemann.

-25-

## ii. Qualified Immunity

Officer Bienemann argues that, even if his actions may have violated Ms. Davila's Fourth Amendment rights, he is entitled to qualified immunity. Having concluded that Ms. Davila has demonstrated that there are no material factual disputes as to whether her Fourth Amendment rights were violated, Officer Bienemann's qualified immunity defense hinges on whether the rights at issue were clearly established as of the date of the incident. Officer Bienemann argues that there was no clearly established law that would have put him on notice as of January 22, 2011,[6] that a request for immigration status, *see Muehler*, 544 U.S. at 100–01, for which a response time is out of his control, would result in an unreasonable seizure, where not only was he waiting for a response from ICE, but then there was clarification to be had, considering the nature of the response. Ms. Davila frames the right differently—that it was clearly established on January 22, 2011, that prolonging a traffic stop to investigate an individual's immigration status without any reasonable, articulable suspicion to believe that the individual lacked lawful status violated the Fourth Amendment. The Court agrees with Ms. Davila's formulation of the right at issue and also with her conclusion. As discussed, Officer Bienemann cannot now claim that time spent waiting for ICE to respond to his request, when there was no reason to doubt Ms. Davila's lawful status, should not count against him.

*Muehler*, as discussed in greater detail above, is factually inapposite to this case and does not bolster Officer Bienemann's qualified immunity argument. For one, the propriety of the immigration status questioning was, in the Court's estimation, a subsidiary issue for the *Muehler* Court. The main dispute in that case was the permissibility of detaining the subject of a search

---

[6] As discussed above, in the Court's estimation, *United States v. Clark* confirms that Officer Bienemann's continued inquiry into Ms. Davila's immigration status and/or identity following the ACD's confirmation of her identity violated her Fourth Amendment rights. 902 F.3d at 411. However, for qualified immunity purposes, the Court has not considered that case nor any other case decided on or after January 22, 2011, the date in which the events in question took place.

warrant using handcuffs while the search warrant was being executed. 544 U.S. at 98–100. And at any rate, the Court was very clear that questioning Ms. Mena about her immigration status was permissible *only* because it did not prolong her detention. *Id.* at 101. Ms. Mena was already going to be detained for several hours while the search warrant was being executed. Asking questions about her immigration status and identity were not additional Fourth Amendment events in light of the preexisting officer-safety justification to detain her. *Id.*

But this situation is quite different. Had this been a typical traffic stop for a headlight violation, Ms. Davila would have been free to leave after approximately ten to twenty minutes. (Bienemann Dep. at 27:2–21). Instead, she remained detained in a parking lot for approximately forty-five minutes longer before being transported handcuffed in the back of a patrol car to the local lockup and then the Allegheny County Jail. In Ms. Mena's case, there was a preexisting and independent justification for her extended seizure and the questions about her immigration status were not additional Fourth Amendment events. Here, Ms. Davila's initial seizure was based only upon her violation of a minor traffic law. The Court is mindful of the Supreme Court's recent decisions emphasizing the importance of describing the right at issue at an appropriate level of specificity. *See, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018) (explaining that a qualified immunity analysis must begin "by defining the circumstances with which the officers were confronted") (internal quotations and alterations omitted). But even so, the Court has little difficulty concluding that the state of the law on January 22, 2011, put Officer Bienemann on notice that his actions would violate Ms. Davila's constitutional rights.

Officer Bienemann, prior to deciding to prolong Ms. Davila's stop at the side of the road, was confronted by the following facts: Ms. Davila was driving without her headlights on; Mr. Garrete admitted to being in the country illegally, and; Ms. Davila claimed she was a legal

resident and had produced a valid (and shortly thereafter, confirmed to be valid) driver's license, proof of insurance, and car registration. Based on these facts, Officer Bienemann admitted that he subjectively had no doubt as to Ms. Davila's lawful immigration status, and there is no evidence in the record that he suspected that Ms. Davila had committed a crime (aside from the headlight violation), or that she had been untruthful in any way. But yet she was not free to leave at any time.

It is beyond debate that it was clearly established on January 22, 2011, that Ms. Davila had a clearly established right to not be subjected to a prolonged traffic stop in order to investigate her immigration status without a reasonable suspicion or probable cause to call her lawful status into question. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, *so long as* those inquiries do not measurably extend the duration of the stop.") (emphasis added); *Caballes*, 543 U.S. at 408 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); *Royer*, 460 U.S. at 500 ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."); *Brignoni-Ponce*, 422 U.S. at 881 ("[T]he stop and inquiry must be reasonably related in scope to the justification for their initiation.").

The purpose of the traffic stop was to investigate a minor traffic violation. That purpose was completed when Ms. Davila's identification was verified at 6:36 p.m. A reasonable police officer in Officer Bienemann's position would know that prolonging Ms. Davila's seizure beyond then, without reasonable suspicion as to her identity or involvement in further criminal activity, would be unconstitutional. Therefore, Officer Bienemann is not entitled to qualified

immunity for the Fourth Amendment claims against him arising out of Ms. Davila's roadside detention.

There are no material factual disputes surrounding Ms. Davila's roadside detention prior to her transport to the Allegheny County Jail, and therefore summary judgment as to liability for Ms. Davila is appropriate as to this claim because Officer Bienemann indisputably violated her rights under the Fourth Amendment to be free from a prolonged seizure without reasonable suspicion or probable cause to support prolonging the seizure.[7] Ms. Davila's motion for summary judgment on this claim will be granted, and Officer Bienemann's motion for summary judgment will be denied. Summary judgment as to liability will be entered on this claim in favor of Ms. Davila and against Officer Bienemann.

## b. Selective Enforcement in Violation of the Equal Protection Clause of the Fourteenth Amendment

### i. Liability

Ms. Davila claims that her rights under the Equal Protection Clause of the Fourteenth Amendment were violated when Officer Bienemann selectively enforced the law or engaged in racial profiling by investigating her immigration status because of her protected characteristics—namely her Hispanic ethnicity and/or national origin. (Pl. Br. in Opp. at 1–2, ECF No. 248). Selective enforcement of facially neutral laws is a violation of the Equal Protection Clause. *See Whren*, 517 U.S. at 813. In order to succeed on this claim Equal Protection Clause claim for selective enforcement, Ms. Davila must demonstrate that "the challenged law enforcement practice had a discriminatory effect and was motivated by a discriminatory purpose." *Carrasca*

---

[7] Because the Court concludes that Ms. Davila was, as a matter of law, subjected to a prolonged investigatory seizure without reasonable suspicion of any criminal wrongdoing, the Court need not address whether her continued seizure rose to the level of a *de facto* arrest that was unsupported by probable cause. *See, e.g., United States v. Sokolow*, 490 U.S. 1, 7 (1989) (explaining that reasonable suspicion is "obviously less demanding" than the probable cause standard).

-29-

*v. Pomeroy*, 313 F.3d 828, 834 (3d Cir. 2002). To prove an officer acted with a discriminatory purpose, it must be demonstrated that he "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (quoting *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). In order to demonstrate a discriminatory effect, Ms. Davila must "show that she is a member of a protected class and that she was treated differently from similarly situated individuals in an unprotected class." *Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002). This may be proven by "naming similarly situated members of an unprotected class" who were treated differently or "by submitting statistical evidence of bias." *Id.* It is undisputed that Ms. Davila, as a woman of Mexican descent, is a member of a "protected class" for these purposes. *Carrasca*, 313 F.3d at 834.

The remaining issues for the Court are whether there are sufficient facts in the record such that a reasonable jury could conclude that Ms. Davila, during the traffic stop, was treated differently from similarly situated individuals in an unprotected class and whether this disparate treatment was because of her ethnicity and/or national origin. As a preliminary matter, the Court agrees with Officer Bienemann in that there is no record evidence that Ms. Davila was initially *stopped* because of her Mexican ethnicity. The record is devoid of any evidence suggesting that Officer Bienemann was then aware of Ms. Davila's Mexican ethnicity or that he pulled over Ms. Davila *because* of her ethnicity.[8] The Court also agrees that, up to the point that Officer Bienemann submitted Ms. Davila's name to ICE, there was nothing out of the ordinary or

---

[8] The probable cause analysis under the Fourth Amendment is a distinct inquiry from whether a law is selectively enforced in violation of the Equal Protection Clause. *Whren*, 517 U.S. at 513; *Carrasca*, 313 F.3d at 836. That being said, it is undisputed that Officer Bienemann had probable cause to pull over Ms. Davila for a headlight violation. In the Court's estimation, this serves to, at minimum, bolster the conclusion that the stop began for legitimate reasons. Officer Bienemann saw that a vehicle was driving after sundown with its headlights off and (initially) took appropriate action. The facts in the record simply do not support any other inference regarding how the stop *began*.

impermissible about Officer Bienemann questioning Ms. Davila and Mr. Garrete about their identities and immigration statuses. But as with Ms. Davila's claims related to her continued detention, the appropriate focus is on the next step that Officer Bienemann took—submitting Ms. Davila's name to ICE to confirm what she had told him, even though he admitted he had no reason to doubt it. In other words, could a jury conclude that Officer Bienemann submitted Ms. Davila's information to ICE, and thereby prolonged the traffic stop waiting for a response from ICE, because of Ms. Davila's apparent ethnicity and/or national origin?

The parties dispute whether Ms. Davila has produced enough evidence to permit a jury to conclude that she has been treated differently from similarly situated individuals in an unprotected class. Mr. Garrete and Ms. Davila are both of Hispanic descent and were both born in Latin American countries, and thus there are no members of an unprotected class against whom Ms. Davila can directly compare her treatment during this specific incident. Ms. Davila argues that no such comparator group is necessary because a jury could conclude based upon this record that, between 2007 and 2011, *all* individuals that were seized by NRJPB officers and then had their names to submitted to ICE were Hispanic. (Pl. Br. in Opp. at 15–16). NRJPB records show that ICE was contacted for immigration inquiries during traffic stops twelve times between 2007 and 2012, including seven times prior to January 22, 2011. (ECF No. 237-8; ECF No. 242-31). The incident reports in the record do, indeed, facially indicate that *all* of the individuals for whom an immigration inquiry was conducted were Hispanic (with the exception of three individuals for whom no ethnicity was provided) or from a Latin American country.[9] (*Id.*).

---

[9] Officer Bienemann denies that all of the individuals that were seized by NRJPB officers and subsequently had their names submitted to ICE were Hispanic. (ECF No. 246 ¶ 99). The incident reports list each "person involved" in an incident and each listing either has an entry labelled "Ethnic:" or explicitly lists the individual's ethnicity. (ECF No. 237-8). Cross-referencing the narratives in the incident reports, each individual that had their name submitted to ICE had an entry of "Ethnic: H" in those reports with an abbreviated denotation for ethnicity. Given these individuals' actual given and surnames, (ECF No. 237-8 at 2–36), it is apparent that "H" refers to "Hispanic." In Incident No. 11-3817, three individuals—Diomedes G. Lujan, Hercules Jesus, and Murillo Remigio Hugo Reynald—had an entry of

When a law or practice implemented by force of law is applied solely to one group and not another without lawful justification, it is a plain violation of the Equal Protection Clause. That has been the law for a very long time. *See Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886). The incident reports in the record only describe one instance in which an individual who was facially described as being "non-Hispanic" had his information submitted to ICE during a traffic stop. (ECF No. 242-31 at 6–9). That individual—Fernando Dalzochio—was described, along with the other three occupants of the vehicle, as being "Brazilian." (*Id.* at 9). So, at any rate, he was still a member of a protected class in the context of this case as being an individual of foreign national origin. The record reflects that every other individual that NRJPB officers reported to ICE who presented valid (and later confirmed to be valid) identification documents during a traffic stop was reported as being Hispanic. (ECF Nos. 237-8, 242-31). And there is no record evidence of a non-Hispanic individual having their name submitted to ICE when their identification documents were lacking.

The decisions to stop a vehicle, detain its occupants, submit the occupants' information to ICE, and continue to detain those occupants while awaiting a response from ICE are all highly discretionary. Thus, there logically would not be records that reflect when Officer Bienemann or other NRJPB officers chose *not* to submit the names of vehicle occupants in unprotected classes to ICE during a traffic stop. *Cf. Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1141 (N.D. Cal. 2000) (refusing to dismiss a complaint where evidence of a discriminatory effect was

_____

"Ethnic: N", presumably indicating that those individuals' ethnicities were not provided. For the purposes of Officer Bienemann's Motion, the Court must view all factual disputes in the light most favorable to Ms. Davila, the non-moving party. Even if it is disputed precisely how many individuals were Hispanic, the Court concludes that a reasonable jury could conclude, based on the information in the incident reports and the record as a whole, that all of the individuals that had their information submitted to ICE were Hispanic, perceived to be Hispanic, or from a Latin-American country. Put differently, a reasonable jury could conclude, based upon this record, that all individuals that had their names submitted to ICE by NRJPB officers belonged to the same protected class or classes that Ms. Davila belonged to. Officer Bienemann has not advanced any evidence that affirmatively refutes this contention.

provided by statistical evidence of racially disparate rates of engaging in traffic stops because it would be "highly doubtful" that police records would exist for similar discretionary actions such as not stopping a particular motorist). Indeed, the Supreme Court has recognized in other discretionary contexts that pattern evidence may be the "only available avenue of proof" of a discriminatory effect. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977); *see also Bradley*, 299 F.3d at 206 n.11 ("In profiling cases, where it is often difficult to submit direct evidence that members of an unprotected class were not targeted for a search, statistical evidence of discrimination may be the only means of proving a discriminatory effect."). This practice—prolonging roadside detentions in order to submit an identification and immigration inquiry to ICE—appears to only be applied by NRJPB officers (including Officer Bienemann) to those seemingly of Hispanic ethnicity or to those of Latin American origin.

A jury could further credit evidence as to Officer Bienemann's conduct in two other traffic stops that he made in 2011. In both stops, similarly as in Ms. Davila's stop, Officer Bienemann submitted the information of apparently Hispanic individuals to ICE following minor traffic violations, prolonging the roadside detentions as he did so. (ECF No. 237-8 at 20–21, 34–36). And there is no evidence in the record that Officer Bienemann has ever submitted the names of someone in an unprotected class to ICE during a similar stop. Considering the record as a whole, Ms. Davila has advanced sufficient facts such that a reasonable jury could conclude that Officer Bienemann's actions had a discriminatory effect on Ms. Davila based on her Hispanic ethnicity and/or national origin.

But even if the Court were to determine that a comparator group was necessary, the Court would nonetheless hold that the question of whether Officer Bienemann's actions had a discriminatory effect should proceed to the jury. Record evidence establishes that NRJPB

-33-

officers engaged in hundreds of stops for Pennsylvania Vehicle Code offenses over a six-month period, (ECF No. 251-2), and by reasonable extrapolation, there would be thousands of stops over a several year period. The record also reflects that over a longer period only people appearing to be Hispanic or from a Latin American country (as self-described by the NRJPB officers generating the reports) had their names and information submitted to ICE by NRJPB officers, and importantly, by Officer Bienemann. Because of this apparently exclusive treatment, such individuals (including Ms. Davila) will necessarily be shown to have been disproportionately affected by this practice, thus demonstrating a discriminatory effect. *See, e.g.*, *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 35 (D.R.I. 2014), *aff'd*, 793 F.3d 208 ("Using [] nation of birth as a sole permissible basis for [] loss of liberty does not pass constitutional muster.").[10]

The viability of this claim thus hinges upon Officer Bienemann's subjective intent behind his decision to submit Ms. Davila's name to ICE and prolong the seizure while he awaited a response. Such determinations ordinarily are appropriately made by the finder of fact. *See, e.g.*, *Christopher v. Nestlerode*, 373 F. Supp. 2d 503, 519 (M.D. Pa. 2005) (holding that "disputed facts that bear on the motivations and justifications of the officials . . . must be left for the jury" in a claim for selective enforcement of a facially neutral law); *A.B.C. Home Furnishings, Inc. v. Town of East Hampton*, 964 F. Supp. 697, 703 (E.D.N.Y. 1997) (observing that "the issue of intent underlying an equal protection claim generally belongs to the trier of fact") (citing *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1216–17 (2d Cir. 1987)). The Court concludes

---

[10] As an illustration, the NRJPB and Officer Bienemann claim they utilize ICE as a resource to verify identities, but logically such identity verification processes (and immigration status queries) may well take longer to complete than other identity verification procedures, as they involve an extra step involving a federal agency/database. Accordingly, in the Court's estimation, Hispanic or foreign-born individuals who fail to present valid identification documents may be subjected to prolonged seizures as compared to individuals in unprotected classes who fail to present valid identification documents because those individuals would not have their names submitted to ICE. Instead, they may have their identities verified through potentially more expeditious local procedures which would not involve an immigration status query.

that there is more than sufficient evidence such that a reasonable jury could conclude that Officer Bienemann submitted Ms. Davila's name to ICE and prolonged her seizure as he awaited a response *because of*, and not merely in *spite of*, her ethnicity and/or national origin. *See Wayte*, 470 U.S. at 610.

At the time that Officer Bienemann chose to submit Ms. Davila's information to ICE he knew that her passenger was Hispanic and had admitted to being in the country illegally, and that Ms. Davila was a Hispanic woman. The first fact—Mr. Garrete's confessed unlawful status or his Hispanic ethnicity—cannot be the basis to justify Officer Bienemann's actions as to Ms. Davila. Not only is it generally "not a crime for a removable alien to remain present in the United States," *Arizona*, 555 U.S. at 407, but it is clearly established that "wrongdoing by one person does not automatically impute wrongdoing to another." *Davila III*, 2016 WL 1252986 at *3. The immigration status and ethnicity of her passenger would have no bearing on or probative value as to Ms. Davila's immigration status. Relying on Ms. Davila's ethnicity to prolong the stop would be a textbook violation of the Equal Protection Clause, as that decision to submit her name to ICE would be *because of* her membership in a protected class. Officer Bienemann's admission that he had *no reason to doubt* Ms. Davila's identity or immigration status eliminates one of the few potentially permissible justifications for Officer Bienemann to submit Ms. Davila's name to ICE—a particularized reasonable suspicion as to the truthfulness of what she had already told him. The Court noted at the motion to dismiss stage that it "appear[ed] that Officer Bienemann had little (if any) legitimate reason, based solely on his request for identification and his questioning of Mr. Garrete, to suspect that Ms. Davila was also unlawfully present." *Davila I*, 979 F. Supp. 2d at 630. Now, Officer Bienemann has *admitted* that there was

no lawful reason to doubt her identity or status. Further factual development has only bolstered Ms. Davila's Equal Protection Clause claim.

The Court also finds Officer Bienemann's arguments to the contrary to be unpersuasive. It is of no moment that "Davila has presented no evidence that Officer Bienemann made any remarks concerning race or heritage that would suggest a racially motivated stop or continued detention, or immigration status inquiry." (Bienemann Br. in Supp. at 14). True enough, but while such evidence would have been additionally probative of a discriminatory purpose, *see Carrasca*, 313 F.3d at 834, it has long been established that such direct evidence is not required to support an Equal Protection Clause claim. *E.g.*, *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 256, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *see also Mody v. City of Hoboken*, 959 F.2d 461, 467 (3d Cir. 1992) (finding evidence of a racially motivated discriminatory practice to be lacking because plaintiffs had not "shown the police uttered racial slurs against Asian Indians *or produced other evidence* of an atmosphere of disparagement") (emphasis added). Direct evidence of affirmative statements of ethnic animus is simply not an element of this claim. As another court long ago observed:

> Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a [] minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their bigotry, that open statements of discrimination are made, so it is rare that these statements can be captured for purposes of proving [] discrimination in a case such as this.

-36-

*Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064 (4th Cir. 1982). For these reasons, that there is no record evidence of Officer Bienemann having made racially or ethnically motivated comments or remarks relative to the events of this case is not dispositive of this issue.

Officer Bienemann also claims that he and other NRJPB officers viewed ICE as a resource for "identity issues[,] language barriers and where an individual admits to being in the country illegally." (Bienemann Br. in Supp. at 14); *see also Arizona*, 567 U.S. at 412 ("ICE's Law Enforcement Support Center operates 24 hours a day, seven days a week, 365 days a year and provides, among other things, immigration status, identity information and real-time assistance to local, state and federal law enforcement agencies.") (internal quotations omitted). Even if this is so, this would further support the suggestion that Officer Bienemann continued to detain and investigate Ms. Davila only because of her Hispanic ethnicity and/or national origin. Ms. Davila provided Officer Bienemann with a valid driver's license, spoke English, and claimed that she was a legal permanent resident of the United States. And, as discussed above, Officer Bienemann *admitted* that he had no doubts as to Ms. Davila's immigration status. None of the "issues" that the ICE LESC purportedly assists with presented themselves here.[11]

### ii. Qualified Immunity

Officer Bienemann also asserts that he is entitled to qualified immunity because the specific facts presented by this case would not have provided him with fair notice that his conduct would violate Ms. Davila's constitutional rights. (Bienemann Br. in Supp. at 23–24). This Court has already held that it was clearly established on January 22, 2011, "that selective

---

[11] Officer Bienemann also cites to *Galarza v. Salzcyk*, No. 10-cv-06815, 2012 WL 1080020, at *14 (E.D. Pa. Mar. 30, 2012), *rev'd on other grounds*, 745 F.3d 634 (3d Cir. 2014), for the proposition that a "driver's license alone does not confirm legal status." (Bienemann Reply Br. at 8, ECF No. 263). Even if this is true, it bears repeating that Officer Bienemann *admitted* that he had no reason to believe that Ms. Davila was unlawfully present. Whatever the driver's license would or would not confirm is irrelevant given that Officer Bienemann admitted that he was not relying on the verification of Ms. Davila's driver's license validity to establish her immigration status.

enforcement based on a person's membership in a particular ethnic group is a violation of the Equal Protection Clause," and it has been since *Yick Wo* was decided in 1886. *See Davila I*, 979 F. Supp. 2d at 633 (citing *Wayte*, 470 U.S. at 608–09); *see also Brignoni-Ponce*, 422 U.S. at 876 (holding that it was unlawful to stop a vehicle where "the only ground for suspicion is that the occupants appear to be of Mexican ancestry"). And, as discussed in relation to Ms. Davila's Fourth Amendment claim, it was clearly established at the time of the incident that officers cannot prolong a roadside stop absent reasonable suspicion justifying the prolonged seizure. *Caballes*, 543 U.S. at 407. Indeed, the Court affirmed in *Davila III* that the rights at issue for the Equal Protection Clause claim were clearly established, and that further factual development was needed to decide the issue of application of such rights in these circumstances. 2016 WL 1252986 at *5. The undisputed facts now foreclose the application of qualified immunity.

Officer Bienemann's attempts to focus on the "specific facts" of Ms. Davila's stop are unavailing. (Bienemann Br. in Supp. at 24). Neither party contests the validity of the initial stop—the proper focus is whether Officer Bienemann was on fair notice that continuing to detain Ms. Davila while he submitted her name to ICE because of her Hispanic origin was violative of her Equal Protection rights. Once again, Officer Bienemann admitted that there were no facts here that would give him reasonable suspicion as to Ms. Davila's identity or immigration status. Other than his generalized experience of sometimes having people lie to him, he has identified no facts about *this* stop that would lead him, based upon his experience, to have a reasonable suspicion about Ms. Davila's truthfulness. *Cf. Arvizu*, 534 U.S. at 273–74. There are also no facts in the record that suggest that Ms. Davila had committed any infractions beyond the headlight violation. The universe of possible motivations for why Officer Bienemann submitted Ms. Davila's name to ICE is quite limited at this juncture—and one of those possibilities remains that

he did so because of Ms. Davila's ethnicity and/or national origin. Officer Bienemann was on fair notice, based on the state of the law on January 22, 2011, that his actions could violate Ms. Davila's Equal Protection rights. *See Davila III*, 2016 WL 1252986 at *5. Therefore, he is not entitled to qualified immunity on this count.

Officer Bienemann's motion for summary judgment on Ms. Davila's Equal Protection Clause claim will be denied. It is up to the jury to decide whether Officer Bienemann acted with a discriminatory intent in submitting Ms. Davila's name to ICE and thereby subjected her to an unconstitutionally prolonged seizure.

## c. False Imprisonment in Violation of the Fourth Amendment

Ms. Davila also alleges that Officer Bienemann violated her Fourth Amendment rights by withholding exculpatory evidence from the Allegheny County Jail which led to her continued detention until she was released the following morning. According to Ms. Davila, once Officer Bienemann learned that Ms. Davila was lawfully present in the United States he had an affirmative duty to personally secure her release from custody.

Officer Bienemann responds that he had no such duty. Alternatively, he asserts that he is entitled to qualified immunity because the existing precedent was not sufficiently clear so as to put him on notice that he was required to provide the information he learned from ICE directly to the ACJ. The Court agrees with Officer Bienemann's characterization of the existing precedent and thus concludes that he is entitled to qualified immunity on this claim. Because the Court concludes that Officer Bienemann's actions were of the type that a reasonable officer could have believed were lawful, *see Anderson*, 483 U.S. at 646 n.6, the Court need not decide whether Officer Bienemann's actions violated Ms. Davila's Fourth Amendment rights. *Pearson*, 555 U.S. at 232–33; *see also Camreta v. Greene*, 563 U.S. 692, 705–07 (2011) (instructing lower courts to

-39-

"think hard, and then think hard again" before defining constitutional rights prior to determining whether the rights at issue were clearly established).

Officer Bienemann asserts that there is no Third Circuit precedent to put a police officer on notice of any duty to seek a subject's release after learning of exculpatory information. He chiefly relies on a non-precedential opinion from the Third Circuit for this point, *Toribio v. Spece*, 558 F. App'x 227, 230 (3d Cir. 2014) ("The existence and scope of an officer's duty to seek to release a suspect after a lawful arrest is unsettled in this Court.") (internal quotations omitted). Because *Toribio* is a non-precedential decision, it is not binding on this Court. *See United States v. Nagle*, 803 F.3d 167, 182 n.9 (3d Cir. 2015) (citing 3d Cir. Internal Operating Procedure 5.7). However, non-precedential opinions may still be cited as persuasive authority. *Prudential Prop. & Cas. Ins. Co. v. Jefferson*, 185 F. Supp. 2d 495, 499 n.1 (W.D. Pa. 2002).

In *Toribio*, the Third Circuit cited to one of its precedential decisions for the proposition that the law in this area is "unsettled." 558 F. App'x at 230 (citing *Wilson v. Russo*, 212 F.3d 781, 792 (3d Cir. 2000)). Notably, *Wilson* was decided before *Schneyder v. Smith*, 653 F.3d 313 (3d Cir. 2011), the case that Ms. Davila relies upon to argue that Officer Bienemann's duty in this scenario was clearly established. Even if the Court were to conclude that the Third Circuit has established that an officer has *some* duty to ensure the release of an improperly detained individual once that officer learns of information that renders that individual's detention unreasonable, the Court agrees that, based on existing precedent, the scope and extent of any such duty remained unsettled on the date of the events at issue here.

A review of the facts of *Wilson* and *Schneyder* is helpful. In *Wilson*, witnesses to a robbery described the suspect as a "very tall" "light skinned black male." 212 F.3d at 784. Another witness told police she saw a shorter, light-skinned black male heading to the scene of

-40-

the robbery around the time it occurred. *Id.* Despite knowing of the discrepancy in the height descriptions, a police officer showed a picture of the shorter suspect to the eyewitnesses and one of the eyewitnesses positively identified him as the robber. *Id.* at 785. An arrest warrant was obtained and the misidentified suspect spent a month in custody. *Id.* The investigating officer later interviewed an individual that provided the arrested individual with an alibi, and this account was verified with other evidence. *Id.* at 792. On this point, the Third Circuit declined to answer the question of whether the investigating officer had a duty to inform the prosecutor of this exculpatory information in order to have the misidentified suspect released. *Id.* In the Third Circuit's view, the new information did not fully dispel the probable cause for the arrest, so even if there were a duty, it would not have been triggered in that case.[12] *Id.*

*Schneyder* presents a case where an officer learned information that undeniably dispelled the justification for a continued detention. In *Schneyder*, a prosecutor secured an arrest warrant for a material witness in an upcoming trial. 653 F.3d at 316. The trial was continued for approximately four months, and the prosecutor failed to inform the issuing judge of the postponement. *Id.* at 317. As a result, the witness was incarcerated for fifty-four additional days. *Id.* at 318. In the Third Circuit's view, a reasonable jury could conclude that this extended detention constituted an unreasonable seizure, a Fourth Amendment violation. *Id.* at 328–29.[13]

---

[12] *Toribio* presents a similar scenario. An individual was arrested pursuant to a warrant, supported by probable cause, for his suspected involvement in a string of bank robberies. 558 F. App'x at 228–29. Toribio was shorter than the actual bank robber as described by witnesses to the crimes. *Id.* at 229. He claimed that his arresting officer was liable for false imprisonment because he should have recognized the height discrepancy. *Id.* at 230–31. The Third Circuit held that this was not "patently exculpatory" evidence. *Id.* at 231. Because of this, as in *Wilson*, the Third Circuit determined that they "need not settle the unsettled issue." *Id.*

[13] The reasonableness of the seizure was not based upon a probable cause analysis because the witness was not detained because the police believed that she had committed a criminal offense. *Schneyder*, 653 F.3d at 323–25. However, it is axiomatic that an arrest and detention that is not based upon probable cause is *per se* unreasonable under the Fourth Amendment. *E.g.*, *Wong Sun v. United States*, 371 U.S. 471, 479–80 (1963). Thus, the Court understands *Schneyder* to apply with equal force to situations where recently discovered information dispels the initial probable cause to detain.

Here, Ms. Davila's continued detention at the ACJ was based upon the belief that Ms. Davila was unlawfully present in the United States. Once it was determined that this was erroneous, Ms. Davila's continued detention would be *per se* unreasonable, as the basis for her detention would no longer exist. But *Schneyder* does not control given the other facts of this case. Officer Bienemann delivered Ms. Davila and Mr. Garrete to the Allegheny County Jail at 8:55 p.m. (Pl. CSF ¶ 80). On his way back from the Jail, he was contacted by ACD and alerted that ICE may have made a mistake about Ms. Davila. (Bienemann Dep. at 91:22–25). Shortly thereafter, he received a phone call from Agent Kenwood in which Agent Kenwood informed Officer Bienemann that Ms. Davila "may have been incorrectly detained and that they were looking into it." (*Id.* at 92:19–93:13). Officer Bienemann asked Agent Kenwood to send confirmation to the station as to what ICE determined. (Pl. CSF ¶ 85). ICE sent ACD confirmation that Ms. Davila was lawfully residing in the United States on 9:50 p.m. on the night of the incident. (ECF No. 242-29). Officer Bienemann admits to personally becoming aware of Ms. Davila's lawful status sometime later in the evening via fax, well before Ms. Davila's eventual release. (Bienemann Dep. at 93:16–19).

This information would have vitiated, beyond any doubt, any reason underpinning Ms. Davila's detention. The ICE detainer issued because it was believed that Ms. Davila was unlawfully present in the United States. Once this belief was dispelled by ICE—the authority that issued the detainer—no reasonable officer would have believed that there was probable cause justifying Ms. Davila's continued detention. Officer Bienemann argues that this is not necessarily true because the detainer did not facially state why ICE requested Ms. Davila's detention. This, in Officer Bienemann's view, distinguishes the ICE detainer from an arrest warrant insofar as he would not have known, based solely on his discovery of Ms. Davila's

lawful status, that there was no longer a basis for the detainer to have issued. Given Officer Bienemann's personal involvement in these events, the absence of any record evidence that Ms. Davila was in the ACJ for any reason other than the ICE detainer, and that the ICE detainer was issued based only on Ms. Davila's perceived status, the Court finds this argument to be wholly unpersuasive. Officer Bienemann—of all people—would have known that the detainer was issued based upon Ms. Davila's erroneously reported unlawful status and for no other reason. Officer Bienemann initially pulled Ms. Davila over and remained with her through her delivery to the jail. He knew that she had not committed any state crimes and that, based upon his interactions with Ms. Davila and his conversations with LESC, ACD, and Agent Tetrault, he well knew that the *sole* reason that the detainer was issued and Ms. Davila was put in the ACJ was because it was believed that Ms. Davila was unlawfully present in the United States. His argument to the contrary does not hold water.

It appears to the Court that had Officer Bienemann simply sat on this information and done *nothing* further, then *Schneyder* may govern this case. However, unlike the prosecutor in *Schneyder*, the record indicates that Officer Bienemann did take *some* action regarding this information and that he would not have been unreasonable in his belief that those actions were sufficient. The record reflects that Officer Bienemann notified his superior, Sergeant Sicilia, of the developments. (Pl. CSF ¶ 87; Bienemann Dep. at 93:20–94:7; Sicilia Dep. at 56:13–59:24). It is also apparent that, unlike the prosecutor in *Schneyder*, Officer Bienemann was not the only individual with knowledge of Ms. Davila's lawful status. Agents at ICE knew. The ACD knew and Sergeant Sicilia, via his conversation with Officer Bienemann, also knew. And of course, shortly after Officer Bienemann learned of the information, the ACJ knew. Further, Officer Bienemann was told by Agent Kenwood that ICE "would handle getting her released" if it was

-43-

determined that she was improperly detained. (Bienemann Dep. at 93:4–5). It appears to the Court that it could have been reasonable for Officer Bienemann to rely on the guidance from the agency that not only issued the detainer, but whose expertise is in immigration law enforcement. It can be fairly disputed whether Officer Bienemann—as the police officer personally responsible for delivering Ms. Davila to the Jail—sufficiently acted on the new information that he received. But his potential mistake as to what the law required in the situation that he faced is precisely what the qualified immunity defense is intended to shield from liability. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense."), *overruled in part on other grounds by Pearson*, 555 U.S. at 236.

The Supreme Court has repeatedly cautioned district courts to avoid "defin[ing] clearly established law at a high level of generality." *E.g.*, *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). A qualified immunity inquiry must begin with "defining the circumstances with which the officers were confronted." *Wesby*, 138 S. Ct. at 591. Thus, the Court must endeavor to define the right at issue within the "specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (internal quotations omitted).

With these principles in mind, the Court concludes that the right at issue here is the right of an individual to be released from custody after the reason justifying her custody was determined to be unfounded and where the officer that arrested the individual was one of multiple individuals that learned that the initial justification was unfounded, yet only reported this new information to his superior. With this formulation of the right in mind, the Court concludes that there was no existing controlling or robustly persuasive precedent that would have put Officer Bienemann on notice that his course of action (or inaction) would have violated Ms.

Davila's constitutional rights in these regards. *See Berg v. Cty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000) (describing part of the qualified immunity inquiry in a related context as whether the officer "reasonably believe[d] that his conduct was lawful in light of the information he possessed at the time").[14]

Our court of appeals, in *Schneyder*, reached the "almost tautological conclusion that an individual in custody has a constitutional right to be released from confinement after it was or should have been known that the detainee was entitled to release." 653 F.3d at 330–31. But as discussed above, *Schneyder* is distinguishable. The Third Circuit found that when a prosecutor— the individual who was both responsible for the witness's confinement and in sole possession of particular knowledge that would have led to her release—kept the information completely to himself, then the prosecutor was potentially answerable for violating the witness's Fourth Amendment rights. Thus, the Third Circuit clearly established that someone in *sole* possession of information that would indisputably lead to an individual's release that does *nothing* with that information may violate an individual's Fourth Amendment rights. Here, as discussed, many individuals knew that Davila was, in fact, lawfully present (including the ACJ) and the Court cannot conclude that every reasonable officer would have then known that it would be insufficient for him to alert his superior of such information, but not personally inform the County Jail. *See Reichle v. Howards*, 566 U.S. 658, 658–59 (2012).

---

[14] The Court observed in an earlier Opinion that "[s]everal courts of appeal have held that an officer's failure to release an individual after the officer knew or should have known that the person was wrongfully detained gives rise to a cause of action under § 1983." *Davila I*, 979 F. Supp. 2d at 631. Further factual development in this case, as well as recent reminders from the Supreme Court, *see, e.g.*, *Wesby*, 138 S. Ct. at 591, have led the Court to reformulate the parameters of the right at issue within the context of the specific facts presented by this case. Accordingly, while the Court's previous recitation of the right remains true as a general matter, a review of the cases cited by the Court in its earlier Opinion reveals that the state of the law was not sufficiently clearly established for qualified immunity purposes as it pertained to the specific facts encountered by Officer Bienemann during the incident.

Moreover, there is not a "robust consensus" among the other courts of appeals that clearly established this right. *Cf. Wilson v. Layne*, 526 U.S. 603, 617 (1999). The First Circuit recognizes that an officer may be liable for false imprisonment if there is "post-arrest discovery of evidence negating, beyond any reasonable doubt, the initial probable cause finding." *Thompson v. Olson*, 798 F.2d 552, 553 (1st Cir. 1986). In *Thompson*, a blind diabetic man was mistakenly arrested for public drunkenness and alleged that he should have been released as soon as the arresting officers realized that he was insulin shock, and not intoxicated. *Id.* But, the First Circuit clarified that the period of detention that the *jailers* and not the arresting officers were responsible for was "outside the scope of [Plaintiff's] claims against" the arresting officers. *Id.* at 555 n.1. The First Circuit explained that it was "possible" that the arresting officers "remained under a duty to act reasonably in informing others, such as the jailers" but "th[at] theory of liability [was] not . . . properly before [them]." *Id.*

The Seventh Circuit has held that a sheriff's continued detention of an individual despite having knowledge that that detention is wrongful was sufficient to state a cause of action under § 1983. *Sivard v. Pulaski Cty.*, 959 F.2d 662, 668 (7th Cir. 1992). But, that cause of action was brought against the officer because she was responsible for the individual's *continued* detention, not *initial* detention. *Id.* Unlike in this case, the claim was not brought against the arresting officer who had turned the plaintiff over to the jail.

The Fifth Circuit also examined a related claim—"whether a police officer has an obligation to release an individual arrested pursuant to a valid warrant when, subsequent to the arrest, the officer receives information regarding the invalidity of the warrant." *Duckett v. City of Cedar Park*, 950 F.2d 272, 279 (5th Cir. 1992). But here, the arrest was warrantless. The new information that Officer Bienemann learned went to the validity of the immigration detainer, but

an immigration detainer is not an arrest warrant. *See generally Galarza v. Szalczyk*, 745 F.3d 634, 641–42 (3d Cir. 2014); *see also Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 296 F. Supp. 3d 959, 973–74 (S.D. Ind. 2017). Thus, the circumstances as between *Duckett* and this case are not sufficiently similar. *See White*, 137 S. Ct. at 552.

The Eleventh Circuit recognized the "constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Cannon v. Macon Cty.*, 1 F.3d 1558, 1563 (11th Cir. 1993). As in *Sivard*, however, this claim was brought against an officer responsible for the plaintiff's *continued* detention. *Id.* In the context of this case, that would be akin to holding those at the ACJ responsible rather than Officer Bienemann.

Given the state of the law on January 22, 2011, a reasonable official facing the factual scenario that Officer Bienemann faced would not be on sufficient notice that his or her conduct would violate Ms. Davila's constitutional rights. As of approximately 10:00 p.m. on the night of the incident, Officer Bienemann knew that Ms. Davila had been incorrectly determined to be unlawfully present and thus should not be detained. But, based upon the evidence in the record, even when viewed in the light most favorable to Ms. Davila, a reasonable jury could not conclude that Officer Bienemann consciously "turned a blind eye" to the information about Ms. Davila's lawful status. *Cf. e.g.*, *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992) (finding a § 1983 violation where an arresting officer "deliberately looked the other way in the face of exonerative evidence indicating that he had arrested the wrong man").

To be clear, Officer Bienemann's actions following his delivery of Ms. Davila to the ACJ would not win him an award for thoroughness or diligence. But the relevant question is not whether Officer Bienemann *could have* done more—he most certainly could have. The relevant

question is whether it was reasonable for him to believe that he had done enough given the information that he came into. Officer Bienemann was told by Agent Kenwood—from the agency that issued the detainer—that ICE would "handle getting her released" if it was determined that she was incorrectly detained. (Bienemann Dep. at 93:5). Officer Bienemann also took the additional step of alerting his superior to the new information and also requested that ICE "send confirmation one way or the other to the station" as to what they discovered about Ms. Davila's immigration status. (*Id.* at 93:6–94:10). It cannot be said that Officer Bienemann was "plainly incompetent" or "knowingly violate[d] the law" by only telling his superior about the new information after ICE agents told him that they would effectuate Ms. Davila's release if they determined they made a mistake. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotations omitted). The law was unsettled as to the scope and extent of any duty that Officer Bienemann had to disclose the information that he learned about Ms. Davila's lawful status in light of the others who had the same information. Accordingly, Officer Bienemann is entitled to qualified immunity on this claim and it will be dismissed as asserted against him.

### Claims Against NRJPB

Ms. Davila asserts that the NRJPB is also constitutionally liable for her prolonged roadside seizure and imprisonment at the Allegheny County Jail. Municipalities and other local governmental entities may be held liable as "persons" as that term is used in § 1983. *Monell*, 436 U.S. at 690. However, these entities may not be liable for the actions of their employees under a *respondeat superior* theory. *Id.* at 691–92. Rather, a "municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." *McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir. 2009) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d

Cir. 1996)). A municipal "policy" is an affirmative action attributable to the municipality through an official act or proclamation. *McTernan*, 564 F.3d at 658 (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990), *superseded by statute on other grounds as stated in*, *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206 (3d Cir. 2017)). Single acts may be considered municipal "policy" where there is "a deliberate choice to follow a course of action . . . from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Whether a decisionmaker possesses this requisite authority is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 142 (1988).

A municipality may also be liable for "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute "custom or usage" with the force of law." *Praprotnik*, 485 U.S. at 127 (quoting *Adickes*, 398 U.S. at 167–68) (internal quotation marks omitted). The existence of a "custom" can be established by showing that a final policymaker had knowledge of a widespread practice and acquiesced to it. *Watson v. Abington Twp.*, 478 F.3d 144, 155–56 (3d Cir. 2007). Further, whether alleging an injury by a policy or a custom, there must be "a direct causal link between the municipal action," *i.e.*, the policy or custom, "and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403–04 (1997); *see also Bielevicz v. Dubinion*, 915 F.2d 845, 850 (3d Cir. 1990) ("A plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered."). When an alleged policy or custom does not facially violate federal law, "causation can be established only by demonstrating that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Berg*, 219 F.3d at 276 (internal quotations and alterations omitted).

In limited circumstances, municipalities and other local government entities may also be found liable when a constitutional violation results from its failure to adequately train or supervise its employees. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However, the Supreme Court has recognized that a local government's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* Accordingly, local governments are only liable for failing to train when such a failure amounts to a "deliberate indifference to the rights of persons" that may come into contact with the governmental employees. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).

Municipal liability claims are generally derivative of the underlying constitutional violation. *Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (internal citations omitted). That is, if no constitutional injury is inflicted, there ordinarily can be no municipal liability claim. This is not an obstacle for Ms. Davila in this case because the Court has already concluded that Officer Bienemann's actions during the roadside detention actually violated Ms. Davila's rights under the Fourth Amendment and may have violated her rights under the Equal Protection Clause of the Fourteenth Amendment. The Court did not reach the issue of whether Officer Bienemann's actions relative to her confinement at the ACJ and after learning of her lawful status may have infringed upon Ms. Davila's constitutional rights because the Court concluded that the right at issue was not clearly established. *Davila III*, 2016 WL 1252986 at *4–*5.

### a. Final Policymaker of the NRJPB

Under Pennsylvania law, "a township police chief is not a final policymaker." *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n.11 (3d Cir. 2010) (citing 53 Pa. C.S. § 66902). Chief

Amann testified at his deposition that he is responsible for developing departmental procedures and the Board approves written policies that he authors. (Deposition of T. Robert Amann ("Amann Dep.") at 19–23, ECF No. 237-1). But even if, in a practical sense, Chief Amann had the final say for how the NRJPB was operationally run day-to-day, "the Supreme Court has forbidden courts from assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Santiago*, 629 F.3d at 135 n.11 (quoting *Praprotnik*, 485 U.S. at 125 n.1) (internal quotations omitted). Although it appears that Chief Amann has broad and extensive authority to run the NRJPB police force, to discipline its officers, and to develop and implement its procedures, the Court concludes that Chief Amann lacks final *policymaking* authority that would subject the NRJPB to "policy" liability under *Monell*.

However, Chief Amann testified on behalf of the NRJPB as a Rule 30(b)(6) witness during his deposition and purported to have knowledge of the applicable customs, practices, policies, and procedures *of the NRJPB*. (Amann Dep. at 9:3–11:13). The NRJPB specifically designated Chief Amann to be its representative and for Chief Amann's testimony to represent the testimony of the NRJPB as an organization. *See* Fed. R. Civ. P. 30(b)(6). So while Chief Amann's *personal* conduct cannot be considered as making municipal policy, neither party disputes that he was competent to testify to and confirm the customs, practices, procedures, and policies *of the NRJPB*. *See Heinrich v. City of Casper*, 526 F. App'x 862, 863 (10th Cir. 2013) (Gorsuch, J.) (observing that a city's Rule 30(b)(6) designee is "surely charged with *knowledge* of municipal policy and should be able to *report* the contents of that policy" but is not a final policymaker solely by virtue of being a Rule 30(b)(6) designee) (emphasis in original); *see also generally* Matthew J. Cron et al., *Municipal Liability: Strategies, Critiques, and a Pathway*

*Toward Effective Enforcement of Civil Rights*, 91 Denv. U. L. Rev. 583, 602–03 (2014) (describing Rule 30(b)(6) depositions as "a ready venue for a plaintiff to garner testimony that it can point to as representing the municipality," including its policies). For these purposes, his testimony is that of the NRJPB, and his admissions are those of the Board. *Kucenko v. Marion Cty. Sheriff*, No. 1:04-cv-1591, 2007 WL 1650939, at \*4 (S.D. Ind. June 1, 2007) (explaining that a Rule 30(b)(6) deponent for *Monell* claim purposes was "designated to testify on the Department's behalf" and "[w]hether he responded in the first or third person, his expressed views [we]re the Department's").[15]

### b. Fourth Amendment Claims

Ms. Davila alleges that the custom, policy, practice, and/or deliberate indifference of the relevant policymaking officials of the NRJPB caused her unlawful roadside detention. More particularly, Ms. Davila argues that the NRJPB maintains an unconstitutional custom or practice of detaining individuals without reasonable suspicion or probable cause to believe that they were engaged in any criminal activity. She asserts that Chief Amann was aware of such practices but failed to take appropriate precautions to prevent future constitutional violations. Alternatively, she argues that her constitutional injuries resulted from the NRJPB's failure to train its officers in a way to prevent the type of injuries that she suffered. The NRJPB argues that Ms. Davila has not produced sufficient evidence to adequately support either of her theories.

---

[15] Indeed, district courts from across the country routinely consider Rule 30(b)(6) deposition testimony as evidence of operative municipal practices, policies, and customs for *Monell* claim purposes. *See, e.g., M.T. v. City of N.Y.*, 325 F. Supp. 3d 487, 496–97 (S.D.N.Y. 2018); *Wilson v. City of Philadelphia*, 177 F. Supp. 3d 885, 898 n.13 (E.D. Pa. 2016); *Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 378–79 (E.D. La. 2016); *Johnson v. Cty. of Riverside*, No. 14-01375, 2015 WL 13649444, at \*5 (C.D. Cal. Feb. 17, 2015); *M.H. v. Cty. of Alameda*, 62 F. Supp. 3d 1049, 1062 (N.D. Cal. 2014); *Dalgarn v. Johnson*, No. 09-cv-01887, 2010 U.S. Dist. LEXIS 98566, at \*30–\*31 (D. Colo. Sept. 20, 2010); *Salazar v. District of Columbia*, 954 F. Supp. 278 (D.D.C. 1996). To be clear, Chief Amann did not become a policymaker because he testified, but here, the policymakers designated Chief Amann to speak for them, under oath, in his testimony.

As a preliminary matter, there is insufficient evidence in the record that the NRJPB had a "policy," written or otherwise, of detaining individuals without reasonable suspicion or probable cause. In support of her argument that the NRJPB had an unconstitutional custom or practice in place, Ms. Davila produced twelve (12) incident reports written by NRJPB police officers that describe other incidents wherein traffic and pedestrian stops were allegedly extended in order to utilize ICE to verify the identities of the individuals involved. (ECF No. 237-8). According to Ms. Davila, these reports evince a pattern of constitutional violations because the officers would demand identification from all individuals and then continue to detain everyone on the scene until everyone's identification was verified. The officers would refer the names of all individuals that were seized during the stop to ICE, even if an individual had valid identification on them. (*Id.*). In Ms. Davila's view, such a practice violates the Fourth Amendment because the continued detentions were not justified by reasonable suspicion of other criminal activity and the verification of the individuals' identities was not necessary to protect officer safety while the officers completed the stops.

Chief Amann testified that the incidents described in the reports were not inconsistent with the guidelines, policies, customs, practices, or procedures of the NRJPB. (Amann Dep. at 127:9–18). The NRJPB does not argue that Officer Bienemann was acting contrary to departmental policies, rather, it contends that there is (or was) nothing unconstitutional about the policies or customs that were allegedly in place. The twelve incidents that Ms. Davila relies upon are summarized as follows:[16]

---

[16] The NRJPB argues that incidents that occurred after January 22, 2011, cannot be used to establish that a pattern of constitutional violations. The Court has already rejected this argument. *Davila I*, 979 F. Supp. 2d at 625 (citing *Beck*, 89 F.3d at 973–74). The NRJPB has not presented a persuasive argument to justify deviating from this settled law of the case. *See Mukasey*, 534 F.3d at 187.

- Incident No. 07-8425 (ECF No. 242-31 at 2–5) – a traffic stop was performed for running a red light. The four vehicle occupants presented identification documents that appeared to be forged or counterfeit. The owner of a Mexican restaurant (also of Hispanic descent) approached the officer and stated that the four occupants were his employees. The owner had valid identification on him. All five individuals on the scene had their names submitted to ICE for further inquiry. The four vehicle occupants were taken to the ACJ at the request of an ICE agent who stated that detainers would issue for them.

- Incident No. 07-8986 (ECF No. 242-31 at 6–9) – a traffic stop was performed for an expired registration sticker. Two of the occupants had valid identification on them (confirmed through dispatch) but the other two did not. All four occupants had their information submitted to ICE for further inquiry. The four vehicle occupants were taken to the ACJ at the request of an ICE agent who stated that detainers would issue for them.

- Incident No. 07-9075 (ECF No. 242-31 at 10–12) – a traffic stop was performed for an expired registration sticker. The driver only had an identification card from Argentina and no driver's license. The driver's information was submitted to the Department of Homeland Security for further inquiry. It was determined that that the driver was not currently in violation of any immigration laws and he was then released to his fiancée.

- Incident No. 08-8103 (ECF No. 242-31 at 11–18) – an officer responded to a call of a suspicious white van. All four males in the van had identification on them (one was a Mexican ID card). All of the occupants had their information submitted to ICE for further inquiry. Three of the occupants were determined to be unlawfully present in the country and they were taken into custody. The officer on the scene was told that detainers would issue for the men.

- Incident No. 08-9721 (ECF No. 242-31 at 19–22) – a traffic stop was performed for an expired registration sticker. None of the three vehicle occupants had identification on them. All of the occupants had their information submitted to ICE for further inquiry. An ICE agent requested that the individuals be detained and the ICE agent later picked up the individuals from the police department and assumed custody of them.

- Incident No. 10-4885 (ECF No. 242-31 at 23–26) – a traffic stop was performed because the driver was driving erratically. The driver produced identification from Mexico and the passenger produced a fake Pennsylvania identification card and a Mexican passport. Both occupants admitted that they were illegal aliens and their information was submitted to ICE for further inquiry. An ICE agent requested that both occupants be detained and emailed detainer forms to the officer on the scene. The occupants were then transported to the ACJ.

- Incident No. 10-7873 (ECF No. 242-31 at 27–29) – a traffic stop was performed for driving at an unsafe speed. The driver only produced a Mexican passport and the passenger had no form of identification. Both of the occupants had their information submitted to ICE for further inquiry. An ICE agent stated that detainers would issue for the vehicle occupants and requested that they be transported to the ACJ. The two occupants were taken into custody and the detainers were obtained at the ACJ.

- Incident No. 11-3817 (ECF No. 237-8 at 12–16) – a traffic stop was performed because of reports of a suspicious vehicle. The driver produced a Maryland driver's license and all occupants had passports (the issuing country was not provided in the report), but they appeared to be outdated or new without immigration stamps. The vehicle occupants spoke English poorly and two of them were unable to provide a current address. All of the occupants had the information submitted to ICE for further inquiry. An ICE agent requested that the occupants all

-55-

be detained for further investigation. The officer on the scene took them into custody and delivered them to the ICE agent.

- Incident No. 11-3997 (ECF No. 237-8 at 20–21) – a traffic stop was performed for driving with a faulty rear brake light. The driver only produced a Mexican driver's license. The driver's name was submitted to ICE for further inquiry. The ICE agent requested that the driver be detained and stated that he would fax a detainer. The driver was taken into custody and transported to the ACJ.

- Incident No. 11-5530 (ECF No. 237-8 at 24–26) – a traffic stop was performed for erratic driving. Both vehicle occupants had identification on them but the information they were telling the officer did not match the information on their identification cards. Both occupants had their information submitted to ICE for further inquiry. It was determined that the occupants were in the country illegally and ICE sent detainers to the police department. The occupants were then taken into custody and transported to the ACJ.

- Incident No. 11-5631 (ECF No. 237-8 at 28–30) – a traffic stop was performed for an illegal left turn. The vehicle had three occupants. One of the occupants produced valid identification, one gave false identification, and the other occupant did not have a form of identification on him. All of the occupants had their information submitted to ICE for further inquiry. Two of the occupants were determined to be in the country illegally and were transported to the ACJ after obtaining a detainer for them.

- Incident No. 11-7497 (ECF No. 237-8 at 34–36) – a traffic stop was performed because the car failed to make a complete stop. The driver produced identification that did not appear to be state-issued. After the driver's identity was confirmed, his name was submitted to ICE for further inquiry. It was determined that the driver was unlawfully present in the country and an

ICE agent advised that a detainer would be faxed to the ACJ. The agent requested that the officer detain the individual despite the officer only having "summary traffic violations against him." The officer complied and transported him to the ACJ.

The Court cannot conclude that these incident reports establish a pattern of constitutional violations so as to definitively establish (as Ms. Davila argues) that the NRJPB had an unconstitutional custom in place. The Court also disagrees with the breadth of the custom asserted by Ms. Davila. That is, there is insufficient evidence to support a conclusion that the NRJPB had a policy or custom of detaining individuals without probable cause or reasonable suspicion to believe that they are involved in criminal activity. The cited incidents are simply too varied in their facts. A review of the incidents reveals that a majority of the individuals' names were submitted to ICE because those individuals lacked identification, because the identification that they provided was facially suspect or issued by another country, or because there were some other indicia that the individuals may not be legally present in the United States. It is a legitimate safety rationale for an officer to confirm the identities of vehicle occupants that are seized during a traffic stop, *Soriano-Jarquin*, 492 F.3d at 500–01, and ICE and the LESC are available resources for officers to verify foreign individuals' identities. *Arizona*, 567 U.S. at 412. If presented with missing, suspect, or foreign-issued identification, it would not be unreasonable in such circumstances for an officer to believe that additional steps to identify the seized individuals are warranted. At most, these incidents suggest the existence of a custom of identifying all individuals seized during a traffic stop—which is a permissible practice. *E.g.*, *Prouse*, 440 U.S. at 659. While it is true that practices unrelated to the stop cannot measurably extend the duration of a traffic stop, *see Rodriguez*, 135 S. Ct. at 1614, identification of all vehicle occupants seized during a traffic stop is considered to be a core element of a traffic stop in order to ensure officer

safety. *See, e.g.*, *Soriano-Jarquin*, 492 F.3d at 500–01. In short, as to most of these incidents, the Court sees no evidence of constitutional violations vis-à-vis most of the seized individuals.[17]

On the other hand, the Court recognizes the parallels between some of the other incidents and the events at issue in this case and cannot foreclose the possibility that there was *some* potentially unconstitutional custom in place. Five of the twelve incident reports describe situations where at least one of the seized individuals had his name submitted to ICE *despite* having either his/her identity or the validity of his/her identification documents confirmed and there being no reasonable suspicion or probable cause that he/she was involved in further criminal activity.[18] Continuing to detain these individuals if there was no reasonable suspicion of further wrongdoing, or doubts about their identities, would not pass constitutional muster. A remaining issue is whether a jury could conclude that these five incidents establish that the NRJPB officers operated under a practice "so permanent and well settled as to constitute a 'custom or usage' with the force of law," *Monell*, 436 U.S. at 691, in traffic and pedestrian stops similar to the one experienced by Ms. Davila. There are no "bright-line rules" establishing a minimum number of incidents that are necessary to demonstrate that a widespread custom or practice is in operation. *See, e.g.*, *Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014). The Third Circuit has held, however, that five or fewer incidents were sufficient such that a jury could conclude that a widespread custom or practice was in place. *See Beck*, 89 F.3d at 972–76

---

[17] Ms. Davila cites to the deposition of multiple NRJPB police officers to bolster her assertion that the NRJPB has an unconstitutional custom of detaining individuals without reasonable suspicion or probable cause. (*See, e.g.*, Amann Dep. at 30:9–32:9; Deposition of Jeffrey Jones ("Jones Dep.") at 13:17–25, ECF No. 237-9). This is not a faithful reading of these transcripts. For example, Sergeant Jones explained that he believed that he may detain someone "[a]s long as necessary . . . [t]o identify the persons involved in the traffic stop." (Jones Dep. at 13:22–25). This testimony, at most, supports the existence of a custom of identifying all individuals involved in a traffic stop. As already discussed in detail, such a practice is not unconstitutional. Neither Sergeant Jones nor Chief Amann spoke to whether there was a custom, policy, or practice in place of detaining individuals without reasonable suspicion or probable cause *despite* having no reason to doubt their identity—and that is the alleged practice or custom that is truly at issue here.

[18] Those incidents are No. 07-8425 (ECF No. 242-31 at 2–5), No. 07-8986 (ECF No. 242-31 at 6–9), No. 08-8103 (ECF No. 242-31 at 11–18), No. 11-5631 (ECF No. 237-8 at 25–30), and No. 11-7497 (ECF No. 237-8 at 34–36).

(concluding that five incidents of excessive force in less than five years could be sufficient to establish a custom of tolerating excessive force); *Colburn v. Upper Darby Twp.*, 838 F.2d 663 (3d Cir. 1988) (concluding that two prior incidents of inmate suicide could be sufficient to establish a "custom of laxity"), *abrogation on other grounds recognized by*, *Barkes v. First Correction Med., Inc.*, 766 F.3d 307, 328 (3d Cir. 2014), *rev'd, Taylor v. Barkes*, 135 S. Ct. 2042 (2015). It appears to the Court that the Third Circuit has, like the Seventh Circuit, declined to establish "bright line" rules as to the number of incidents needed for a jury to conclude that a municipality was operating under a particular custom. Thus, the Court cannot conclude that the five similar instances cited by Ms. Davila here are insufficient, as a matter of law, to establish whether a particular custom existed.

Based on a review of the twelve incidents cited by Ms. Davila, whenever an NRJPB police officer was faced with an individual presenting valid identification along with one or more individuals without valid identification, or with suspect identification, NRJPB police submitted *all* of the individuals' names to ICE. Even if only five of the twelve incidents presented such a scenario, it cannot be ignored that the NRJPB officers seemingly treated the individuals with "confirmed" identification the same in each of these five instances. It may be true there was a reasonable basis to submit *some* of the individuals' names to ICE in those five instances, *i.e.*, some of the incidents describe individuals failing to produce identification or producing suspect identification. But prolonging the detention of the individuals with valid and confirmed identification in order to submit *their* names to ICE is not justified simply because the officers would already be contacting ICE as to others. That would run afoul of the requirement of particularized reasonable suspicion to prolong a seizure of a person. *See, e.g.*, *Cortez*, 449 U.S. at 417–18. What is sauce for the goose is not sauce for the gander in this context.

But this alone does not carry the day for Ms. Davila on this claim. For liability to attach under § 1983, she must demonstrate that the relevant policymaker had knowledge of, and acquiesced to, the practice. *Watson*, 478 F.3d at156.

It is undisputed that Chief Amann generally reviewed incident reports. (Amann Dep. at 46:4–10, 48:12–49:10). According to Ms. Davila, this demonstrates that he had the requisite awareness of the "pattern" of constitutional violations described in the referenced reports. Not so. For one, Chief Amann is not a final policymaker for the NRJPB, *Santiago*, 629 F.3d at 135 n.11, and there is no evidence in the record that Chief Amann ever made the final policymakers aware of the cited incident reports. And even if he had, Ms. Davila has not cited to any authority, nor is the Court aware of any, that suggests that the act of reviewing regularly prepared reports is alone sufficient to place a decisionmaker on notice of alleged constitutional violations so as to lay the basis of a knowing acquiescence to those practices. All of the cases cited by Ms. Davila on this point are distinguishable. For instance, *Beck* involved a claim that the City of Pittsburgh maintained a custom of tacitly authorizing its officers to use excessive force. 89 F.3d at 967. The plaintiff introduced evidence of five other *written complaints* lodged against the officer that allegedly used excessive force against him, *id.* at 969–70, along with a year-end report of the police department that highlighted an ongoing issue of excessive force within the department and low rates of enforcement related to it. *Id.* at 975. The Third Circuit concluded that a jury *could have* inferred, based on this evidence, that the City of Pittsburgh "knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers." *Id.* at 976.

*Miniter v. City of L.A.*, No. 10-05826, 2011 U.S. Dist. LEXIS 161186 (C.D. Cal. Sept. 9, 2011), is similar. There, the court concluded that a report on previous exercises of police brutality would be relevant to a plaintiff's *Monell* claim premised on a custom of police brutality.

*Id.* at \*14–\*15. And, *Chinniah v. E. Pennsboro Twp.*, No. 08-cv-1330, 2009 U.S. Dist. LEXIS 19647 (M.D. Pa. Mar. 12, 2009), addressed a motion to dismiss. There, the court determined that the motion should be denied after *accepting the plaintiff's allegation as true* that the municipality's policymakers had knowledge of an allegedly unconstitutional practice so as to knowingly acquiesce in it. *Id.* at \*9. The Court finds this opinion to be of little value here in the context of summary judgment motions, where the plaintiff must now produce evidence such that a jury could conclude that the NRJPB policymakers knowingly adopted or acquiesced in the alleged unconstitutional practice.

The evidence introduced by Ms. Davila fails to meet this test. It is of a significantly different kind and degree than the evidence in *Beck* and *Miniter*. Rather than pointed and direct complaints about a specific practice (*e.g.*, excessive force), Ms. Davila has only produced general narratives of traffic stops that resulted in no formal complaints. It strikes the Court as unrealistic that (potentially) five allegedly unconstitutional seizures spread out between 2007–2012 that occurred out of hundreds or thousands of traffic stops, *see* (Defs.' SMF ¶ 30), could have sufficiently put any policymaker on notice that something was constitutionally amiss with how the traffic stops at NRJPB were being conducted in relation to ICE inquiries. The record evidence is far too attenuated to support such a conclusion.

Because the Court concludes that, as a matter of law, there is insufficient record evidence such that a reasonable jury could conclude that any of the NRJPB policymakers had knowingly acquiesced to the allegedly unconstitutional custom asserted by Ms. Davila, Ms. Davila's Fourth Amendment claim against NRJPB fails. *McTernan*, 564 F.3d at 658. Thus, the Court need not reach the issue of whether the alleged custom proximately caused the deprivation of Ms.

Davila's constitutional rights. Summary judgment will be granted in favor of the NRJPB on this claim and Ms. Davila's motion for summary judgment as to this claim will be denied.

### c. Fourteenth Amendment Claims

Ms. Davila next argues that she was unlawfully detained because of her Hispanic ethnicity and/or national origin in conformity with a custom, policy, or practice of the NRJPB. As with her Fourth Amendment *Monell* claim, Ms. Davila argues that the twelve (12) cited incidents reveal that the NRJPB had a custom, policy, or practice of selectively enforcing the law by only submitting the information of Hispanic individuals to ICE. The NRJPB explains the incidents differently. In its view, ICE was only contacted because the individuals lacked identification, spoke little English, or presented false identification. However, the NRJPB glosses over the five incidents in which individuals that *did* present valid identification nonetheless had their seizures prolonged so that their names could be submitted to ICE for further inquiry. Based on the incident reports, it is undisputed that all of these individuals were Hispanic, from a foreign country, or perceived as being Hispanic.[19] (ECF Nos. 237-8, 242-31). As explained above with respect to the equal protection claims against Officer Bienemann, Ms. Davila has produced sufficient evidence of a potentially discriminatory custom since it appears that Hispanic individuals—and only Hispanic individuals—are subjected to prolonged seizures for the purposes of an ICE records check even after presenting valid identification. The record is devoid of a single instance in which a non-Hispanic person's name and information was submitted to ICE in connection with a traffic or pedestrian stop.

---

[19] Once again, those incidents are No. 07-8425 (ECF No. 242-31 at 2–5), No. 07-8986 (ECF No. 242-31 at 6–9), No. 08-8103 (ECF No. 242-31 at 11–18), No. 11-5631 (ECF No. 237-8 at 25–30), and No. 11-7497 (ECF No. 237-8 at 34–36). In Incident No. 07-8986, three of the seized individuals were described as being "Hispanic" and one individual—Fernando Dalzochio—was listed as being "non-Hispanic." (ECF No. 242-31 at 7–8). However, in the officer narrative of the incident, all of the men were referred to as "Brazilians." (*Id.* at 9). Thus, for Equal Protection Clause purposes, it is undisputed that all four men were members of a protected class either by virtue of their national origin or perceived ethnicity.

-62-

However, like the Fourth Amendment claim above, the Court concludes that there is insufficient evidence in the record such that a reasonable jury could conclude that any NRJPB policymaker had knowledge of this practice and acquiesced to it. Once again, there is no evidence of an explicit "policy" of the NRJPB to submit only the names of Hispanic individuals to ICE. Thus, Ms. Davila's claim depends on the existence of a custom. The Court observes that at most five instances out of the multiple hundreds of conducted traffic stops conducted between 2007 and 2012 potentially implicate constitutional concerns. As before, the record reflects no complaints, reports, or allegations of wrongdoing in relation to those incidents. For substantially the same reasons as with Ms. Davila's Fourth Amendment *Monell* claim, the Court concludes that the act of the Chief's review of reports is too tenuous of a basis for a jury to rationally conclude that any policymaker had knowingly acquiesced to such a practice, or should have been on notice of such a practice. For this reason, this claim also fails. Accordingly, the Court need not reach the issue of whether the alleged custom proximately caused the deprivation of Ms. Davila's constitutional rights. Summary judgment shall be granted in favor of the NRJPB on this claim and Ms. Davila's motion for summary judgment as to this claim will be denied.

### d. Failure to Train

Ms. Davila also asserts that the NRJPB failed to provide adequate training to prevent violations of the Fourth Amendment and Equal Protection Clause, such as those allegedly suffered by herself. Liability under this theory can only be proven "[i]n limited circumstances" and "[a] municipality's culpability . . . is at its most tenuous" in this context. *Connick*, 563 U.S. at 61 (citations omitted). Indeed, the "municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* (quoting *Canton*, 489 U.S. at 388) (internal quotations and

-63-

alterations omitted). This is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bryant Cty.*, 520 U.S. at 410). To prove such deliberate indifference, it is "ordinarily necessary" to demonstrate "[a] pattern of similar constitutional violations by untrained employees" and "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." *Connick*, 563 U.S. at 61–62 (quoting *Bryant Cty.*, 520 U.S. at 407–09).

The Court has already concluded that there is insufficient evidence to conclude that any policymaker at the NRJPB could have been said to fairly be on notice that there was a "pattern" of constitutional violations as described in the incident reports. Without such actual or constructive knowledge of past violations, the NRJPB policymakers could not have been deliberately indifferent to the rights of persons with whom the NRJPB officers would come into contact. *See Connick*, 563 U.S. at 62. The Court also concludes that these incidents would not "fall within the narrow range . . . of single-incident liability." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 224 (3d Cir. 2014) (citing *Connick*, 563 U.S. at 64). The risk of constitutional harm suffered here would not be so obviously foreseeable that no pattern of previous violations was necessary to establish the need for the training. This is not a case of officers generally not knowing the standards for how long they are permitted to detain an individual, as Ms. Davila casts it. This is a case involving quite specific interactions involving immigration matters and ICE. The record indicates that NRJPB officers received general training to deal with the general scenarios they would encounter, including how to conduct traffic stops, (Defs.' SMF ¶¶ 10–13), and training relative to racial profiling. (*Id.* ¶ 14).

Given the low frequency of alleged violations out of the hundreds of traffic stops conducted annually, the admitted existence of relevant general training protocols, and (most importantly) the lack of any complaints or adequate notice that these measures were ineffective, the Court concludes that no reasonable jury could conclude that the NRJPB's training protocols or supervisory procedures were so woefully inadequate that they amount to a deliberate indifference to a known risk of constitutional harms. *See Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165 (3d Cir. 2017) (affirming grant of summary judgment in favor of a school board despite the school board not having a training protocol for its football coaches to mitigate concussion risks, beyond a handbook for dealing with injured student athletes, in part because there was no pattern of recurring head injuries within the football program); *see also Williams v. Borough of West Chester*, 891 F.2d 458, 467 n.14 (3d Cir. 1989) (explaining that merely negligent training practices are insufficient to incur liability).

#### e. Custom or Policy of Arresting Individuals Pursuant to ICE Detainers

Ms. Davila asserts that, on January 22, 2011, the NRJPB maintained a policy of requiring its officers to comply with all ICE detainers and that this policy was the cause of her unlawful detention. The NRJPB disagrees with the framing of the asserted policy. Both parties rely primarily on the deposition testimony of Chief Amann, the Rule 30(b)(6) designee for the NRJPB, for their positions. The evidence is clear that there was no explicit *policy* of requiring officers to comply with and enforce all ICE detainers. Chief Amann unequivocally testified that the NRJPB had no policy for detaining individuals suspected of violating immigration laws, (Amann Dep. at 41:7–20), nor is the Court aware of any other evidence of such a policy. He did, however, repeatedly acknowledge that the NRJPB had a more general policy of cooperating with and assisting other law enforcement agencies. (*E.g.*, *id.* at 50:10–16, 51:14–19). Other portions

of Chief Amann's deposition testimony do, however, conclusively demonstrate that the more specific practice of cooperating with ICE, a federal law enforcement agency, was subsumed within this general policy of cooperation. For example, Chief Amann testified that the NRJPB would not treat a request from ICE "any differently from a request from any other law enforcement agency to detain an individual." (*Id.* at 78:2–11). In his words, "[i]f [ICE] says they have a detainer on them, it's as good as an arrest warrant for us." (*Id.* at 78:24–25).[20]

Moreover, the incidents cited by Ms. Davila evince a pattern of behavior whereby NRJPB officers would take individuals into custody following a routine traffic or pedestrian stop based only on a detainer from ICE.[21] The record does not reflect a single incident where an NRJPB officer refused to comply with an ICE detainer. Based on the foregoing, the Court concludes that the record conclusively demonstrates that in practice the NRJPB had a *custom* of complying with all ICE detainers. The simultaneous existence of a more specific custom and the more general policy of cooperation described by Chief Amann on behalf of the NRJPB is not an either-or proposition. That is, on this record the Court discerns no difficulty in concluding as a matter of law that the NRJPB admittedly had a general *policy* of cooperating with other law enforcement agencies, and that the extent of this cooperation was so strong with respect to ICE such that the department had a widespread *custom* of treating all ICE detainers as mandatory.[22]

---

[20] Of course, as a legal matter, a detainer administratively issued unilaterally by ICE as to at most a civil law violation is not for these purposes akin to a warrant for arrest, issued upon probable cause, by a neutral and detached judge. Not even close.

[21] *See, supra*, note 18.

[22] Indeed, Chief Amann (testifying in his deposition on behalf of the NRJPB) appears to have equated mandatory enforcement of ICE detainers with a general policy of cooperating with other law enforcement agencies:

> Q. Now, you said it's no longer mandatory. Was it previously mandatory that
> officers comply with ICE requests to detain individuals?
> A. Was it previously?
> Q. Correct.

It is also beyond dispute that the NRJPB knowingly acquiesced in these practices. Chief Amann, testifying on behalf of the NRJPB, described the extent of the NRJPB's cooperation with ICE during his deposition. (Amann Dep. at 78:2–80:13). If ICE "had a detainer" then the NRJPB "honored it [and] assisted them." (*Id.* at 60:2–5). Thus, the only remaining issue is whether this custom caused the deprivation of Ms. Davila's constitutional rights during the night in question.

As a preliminary matter, the Third Circuit held in *Galarza* that a municipality's custom of mandatorily complying with all ICE detainers could be the basis of constitutional liability because such detainers are permissive. 745 F.3d at 645. However, it was not clearly established in 2011 that optional compliance with ICE detainers was permissible. Such was the basis of the Court's determination that Officer Bienemann was entitled to qualified immunity for his role in arresting Ms. Davila pursuant to the detainer. *Davila IV*, 2016 WL 1252986 at *5.

That said, the defense of qualified immunity is not available to municipalities and local governmental units. *Owen v. City of Independence*, 445 U.S. 622, 638 (1980). As illustrated in *Galarza* itself, municipalities may be liable for unconstitutional policies even though the law was not clearly established. 745 F.3d at 645; *see also Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 468–70 (4th Cir. 2013) (granting qualified immunity to individual police officers that detained an individual pursuant to an ICE detainer on the grounds that the law was not clearly established, but holding that the municipality that employed them may still be liable). Ultimately, the Court concludes that adherence to a custom and practice enforcing all ICE detainers would have been facially unconstitutional in 2011, and at minimum, adherence to such a custom would

---

A. It was our practice to cooperate and assist agencies, that being federal, state and local.

(Amann Dep. at 88:18–24).

amount to a deliberate indifference as to the constitutional rights of others. An overview of what these detainers are and how they fit in to the larger scheme of immigration law enforcement is helpful to contextualize this analysis.

Overview of Immigration Law Enforcement

The "comprehensive federal statutory scheme for regulation of immigration and naturalization" is set forth in the Immigration and Nationality Act (the "INA"), codified at 8 U.S.C. §§ 1101 *et seq. See Chamber of Commerce of United States v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 359 (1976)). The Supreme Court provided a detailed explanation of the statutory scheme for federal immigration law enforcement in *Arizona v. United States*, 567 U.S. 387 (2012). At issue in *Arizona* was whether federal immigration law preempted a state law aimed at deterring illegal immigration through increased enforcement at the local level. *Id.* at 392. Relevant here is the *Arizona* Court's discussion of Section 6 of the challenged state law, which would have allowed a local police officer to perform a warrantless arrest of a person believed to have committed any public offense that made him or her removable from the United States. *Id.* at 407. The Court emphasized that generally "it is not a crime for a removable alien to remain present in the United States." *Id.* (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)). Rather, removal of unlawfully present aliens is a civil matter. *Arizona*, 567 U.S. at 396; *see also Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("[R]emoval proceedings are civil in nature[.]"). It has been long-settled that local law enforcement agencies may enforce *criminal* immigration violations, but lack the authority to enforce civil violations. *See, e.g.*, *Gonzales v. City of Peoria*, 722 F.2d 468, 474–75 (9th Cir. 1983), *overruled on other grounds by*, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999); *Gutierrez v. City of Wenatchee*, 662 F. Supp. 821 (E.D. Wash. 1997); *Gates v. Sup. Ct.*,

238 Cal. Rptr. 592 (Cal. Ct. App. 1987). Indeed, "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." *Arizona*, 567 U.S. at 413.

The Supreme Court in *Arizona* determined that Congress had already enacted a comprehensive enforcement scheme that only authorized warrantless arrests based on possible removability in limited circumstances. *Id.* at 410. Thus, Arizona's challenged statute was preempted, as it would have authorized local officers to perform such arrests as a matter of course. *Id.* This is not to say that local enforcement agencies cannot cooperate with federal immigration authorities. The INA specifically outlines such a manner of cooperation in 8 U.S.C. § 1357(g). *See Arizona*, 567 U.S. at 408–10. Except in limited other circumstances not present here, such cooperation requires a formal, written agreement between the state and federal government. 8 U.S.C. § 1357(g)(1). Such an agreement also requires certifications that the state officers have received adequate training on relevant federal immigration laws, and that such officers will be subject to the direction and control of the United States Attorney General. *Id.* §§ 1357(g)(2)–(3). It is undisputed in this case that no such agreement existed between the NRJPB and the federal government.

One of the primary avenues for federal-state cooperation is through the issuance of immigration detainers. These are "creature[s] of regulation," *Lopez-Aguilar*, 296 F. Supp. 3d at 970, and are provided for in 8 C.F.R. § 287.7. A detainer is essentially a request that a local law enforcement agency retain custody of an alien such that ICE can assume custody of the alien upon his or her release. *See generally Galarza*, 745 F.3d at 639–42. Contrary to the NRJPB's asserted belief, "[a] detainer is not a criminal warrant, but rather a voluntary request that the law enforcement agency advise DHS, prior to release of the alien[.]" *Buquer v. City of Indianapolis*, No. 1:11-cv-00708, 2013 WL 1332158, at *3 (S.D. Ind. Mar. 28, 2013) (internal quotations and

alterations omitted). As acknowledged by the *Galarza* court, detainers have been long characterized and treated by the courts and ICE itself as *requests*. 745 F.3d at 640–41 (collecting cases from the Sixth, Second, Fourth, First, and Fifth Circuits); *id.* at 641 ("Since at least 1994, and perhaps as early as 1988, ICE (and its precursor INS) have consistently construed detainers as requests rather than mandatory orders."). As requests, these detainers do not arm the local law enforcement agencies with additional authority to detain an individual. They never have. A local law enforcement agency choosing to comply with an immigration detainer must still do so constitutionally and in a manner consistent with state and local law. 8 U.S.C. § 1357(g)(1); *see also Lunn v. Commonwealth*, 78 N.E.3d 1143, 1157–59 (Mass. 2017). In the context relevant to Ms. Davila's claims, any seizure premised on an immigration detainer must be justified by independent probable cause to believe that a crime had been committed.

## A Local Law Enforcement Agency Cannot Detain Based Solely on an Immigration Detainer

This Court is far from the first to consider the propriety of a local law enforcement agency's detention of an alien that is solely premised on the agency's cooperation with an immigration detainer. Indeed, courts across the country have "determined that when local law enforcement agencies hold someone pursuant to a detainer—and without separate probable cause that the person has committed a crime—such detention gives rise to a Fourth Amendment claim against the local law enforcement." *Creedle v. Miami-Dade Cty.*, — F. Supp. 3d —, 2018 WL 6427713, at *20 (S.D. Fla. Nov. 9, 2018) (collecting authorities); *see also Abriq v. Hall*, 295 F. Supp. 3d 874, 881 (M.D. Tenn. 2018); *Ochoa v. Campbell*, 266 F. Supp. 3d 1237, 1258–59 (E.D. Wash. 2017); *Lopez-Aguilar*, 296 F. Supp. 3d at 977–79.

The Court concludes that the thorough and well-reasoned analysis by the Middle District of Tennessee, addressing a similar scenario, is particularly persuasive. Stated succinctly by the

*Lopez-Aguilar* court, "seizures conducted solely on the basis of known or suspected civil immigration violations violate the Fourth Amendment when conducted under color of state law." *Lopez-Aguilar*, 296 F. Supp. 3d at 975 (citing *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 464–68 (4th Cir. 2013); *Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012)). "[E]ven in cases where ICE has or supplies probable cause to believe a noncitizen is deportable for a civil immigration violation, such probable cause, without more, does not justify the seizure of a person under color of state law." *Lopez-Aguilar*, 296 F. Supp. 3d at 976. A state has interests in arresting an individual for a criminal offense, namely, "ensuring a suspect's appearance at trial, preventing him from continuing his offense, and enabling officer to investigate the incident more thoroughly." *Id.* (quoting *Virginia v. Moore*, 553 U.S. 164, 173–74 (2008)) (internal alterations omitted). But such a justification is lacking in the context of civil immigration law violations. There, "[t]he state has no legitimate interest in effecting the seizure," *id.* at 977, because "[t]he authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government," *Arizona*, 567 U.S. at 409–10 (quoting *Truax v. Raich*, 239 U.S. 33, 42 (1915)), and states have no authority to adjudicate deportability. *Lopez-Aguilar*, 296 F. Supp. 3d at 977. It follows that a seizure conducted solely on the basis of an immigration detainer would be *per se* unreasonable and violative of the Fourth Amendment.

In this case, the record demonstrates that the NRJPB customarily enforced all ICE detainers, because, after all, for the NRJPB, ICE detainers were "as good as" arrest warrants, (Amann Dep. at 78:24–25), and if ICE had issued a detainer, then NRJPB "honored it" and "assisted them." (*Id.* at 60:2–4). But this begs the question—an arrest warrant *for what*? Local police officers generally must have probable cause that a *crime* has been committed in order to arrest someone. As Chief Amann acknowledged, "[i]mmigration law is civil, not criminal." (*Id.*

at 37:17). If detainers *by themselves* are treated "as good as" arrest warrants, probable cause of criminal activity was at most an optional consideration for NRJPB officers performing warrantless arrests when there was an ICE detainer in play. The unconstitutionality of such a practice would have been abundantly clear during the incidents at issue here because it would result, in some instances, in the seizure and detention of individuals without probable cause that a crime had been committed by them. *See, e.g.*, *Beck v. Ohio*, 379 U.S. 89, 96 (1964). This conclusion is all the clearer following *Arizona*, as confirmed by numerous lower courts in wake of that decision, as cited above. And of note, some of those decisions applied the holding in *Arizona* to police department practices and policies that occurred well prior to the Supreme Court's ruling. *E.g.*, *Santos*, 725 F.3d at 468–70; *Melendres*, 695 F.3d at 1000–01. The Court sees no reason to not do so here as well.

Accordingly, the Court is unpersuaded by the NRJPB's contention that the NRJPB policymakers could not have been "deliberately indifferent" to a risk of constitutional harms because it was yet to be established that mandatory compliance with ICE detainers was unconstitutional. That framing misses the point. It may be true that *Arizona*, *Galarza*, and a litany of cases in the lower courts have since refined and clarified some of the many intricacies of federal/state cooperation in the immigration law sphere, but focusing on the granular aspects of these decisions misses the forest for the trees. A known or obvious consequence of enforcing *all* ICE detainers, or treating them "as good as" arrest warrants, logically resulted in at least *some* people being detained by the NRJPB solely because of the detainer. It was well-established in 2011 that, generally, civil violations of the law do not justify arrests. *Lopez-Aguilar*, 296 F. Supp. 3d at 976 (citing *Doe v. Metro. Police Dep't*, 445 F.3d 460, 469 (D.C. Cir. 2006); 4 William Blackstone, *Commentaries* 289). Many courts, and even ICE itself, had taken the

consistent position that ICE detainers were mere requests, *Galarza*, 745 F.3d at 640–41, and it was well-established that removal proceedings were civil, not criminal, matters. *E.g.*, *Lopez-Mendoza*, 468 U.S. at 1038. It is also undisputed that there was not a formal agreement pursuant to 8 U.S.C. § 1357(g) between ICE and NRJPB in place on January 22, 2011. Thus, the NRJPB had no authority to detain individuals (let alone cause them to be put in jail) based on nothing more than a civil immigration detainer. *See Lopez-Aguilar*, 977 F. Supp. 3d at 977 ("Only when acting under color of federal authority, that is, as directed, supervised, trained, certified, and authorized by the federal government, may state officers effect constitutionally reasonable seizures for civil immigration violations."). Therefore, the policymakers at NRJPB were necessarily charged with knowing (or were deliberately indifferent to the possibility) that enforcing all ICE detainers would result in some individuals being arrested solely for a violation of civil immigration laws and without probable cause that a crime had been committed—and it was, or should have been, known in 2011 that such arrests would be unconstitutional.

To be clear, the Court is not saying that it was unconstitutional for the NRJPB to have a general policy of cooperating with other law enforcement agencies. Nor would it be unconstitutional to generally cooperate with ICE. But customarily enforcing ICE detainers in a manner such that individuals are arrested and detained on the basis of the ICE detainer alone is another matter.

A § 1983 plaintiff bears the additional burden of establishing "a "plausible nexus" or "affirmative link" between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d at 850 (citing *Estate of Bailey v. Cty. of York*, 768 F.2d 503, 507 (3d Cir. 1985), *overruled on other grounds by DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)). That is, a plaintiff must demonstrate that the specific

-73-

municipal action caused the deprivation of her federal rights. *Brown*, 520 U.S. at 404. It is not necessary to demonstrate that the injuries "were the *direct* result of *formal* departmental procedures." *Bielevicz*, 915 F.2d at 851. Rather, a plaintiff must simply establish "that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [the plaintiff's] injury." *Id.*

The record evidence establishes an NRJPB custom of enforcing all ICE detainers and thereby arresting individuals pursuant to those detainers without a probable cause determination of the commission of a crime, along with a direct and substantial causal nexus between that custom and the constitutional injury suffered by Ms. Davila. After all, Ms. Davila is alleging precisely the same injury—an unreasonable seizure unsupported by probable cause and in violation of the Fourth Amendment—that would be *the* natural consequence of the alleged custom. A "heightened inclination" of NRJPB officers (including Officer Bienemann) enforcing a detainer at the behest of ICE, without questioning whether there was probable cause for an arrest, would be a "highly predictable consequence" of such a custom existing within the NRJPB. *See Merman v. City of Camden*, 824 F. Supp. 2d 581, 593–94 (D.N.J. 2010) (holding that a § 1983 sufficiently demonstrated a causal nexus between an alleged municipal custom and the plaintiff's injury) (internal quotations omitted).

Indeed, a review of officer narratives from the incident reports in the record reveals that NRJPB police officers detained individuals anytime that ICE issued a detainer for the individuals, but released the individuals from the scene anytime that ICE did not issue a detainer and there was no probable cause that the individuals committed any other crimes. (ECF No. 237-8). For example, Incident No. 07-9075 involved a routine traffic stop for an expired inspection sticker. The driver could only produce identification from Argentina and the officer on scene

contacted DHS for an immigration inquiry. (*Id.* at 47). After an hour, DHS informed the officer that the driver was legally admitted into the United States and because "no indication for detainment was stated" the officer released the individual to his fiancée. (*Id.*). Contrast that sequence with Incident No. 11-7497, which also began as a routine traffic stop. (*Id.* at 35–36). The officer on scene—Andrew Bienemann—contacted ICE "in reference to [the driver's] status" after verifying the driver's identity and performing a check for outstanding warrants. (*Id.*). Officer Bienemann then "inquir[ed] if they wanted him detained" and advised ICE that he "only had summary traffic violations" against the driver. (*Id.*). ICE requested that the driver be detained and conveyed that they would fax a detainer. (*Id.*). Officer Bienemann "advised that [he] would file a traffic citation" and proceeded to arrest the driver and transport him to the ACJ. (*Id.*). There is no record evidence that an NRJPB police officer ever released an individual following a traffic stop despite ICE issuing a detainer for the individual. This reinforces the existence of the custom of enforcing all ICE detainers, but also makes causation in Ms. Davila's case undeniable. If ICE issued a detainer for an individual, the NRJPB arrested that individual, no matter what. Here, ICE issued a detainer for Ms. Davila. Ms. Davila committed no other offenses apart from the headlight violation. Despite this, Ms. Davila was arrested *because* ICE had issued a detainer, and *because* NRJPB officers customarily enforced all ICE detainers.

Finally, the NRJPB asserts that Ms. Davila's detention cannot be attributable to the NRJPB's policies because Officer Bienemann was acting pursuant to Agent Tetrault's directions to detain Ms. Davila. Relying on *Couden v. Duffy*, 446 F.3d 483, 499 (3d Cir. 2006), the NRJPB argues that these directions temporarily transformed Officer Bienemann into a federal agent and thus Ms. Davila's alleged harms could not have resulted from any NRJPB policy. Essentially, the NRJPB argues that Officer Bienemann was acting under federal rather than state law when he

detained Ms. Davila pursuant to the ICE detainer. Preliminarily, the Court does not agree with the NRJPB's reading of *Couden*. While it is true that *Couden* held that a local law enforcement officer could temporarily become an agent of the federal government so as to expose the federal government to potential constitutional liability, *id.*, it does not follow that this absolves the local law enforcement agency of their own liability. *See, e.g.*, *Morales*, 996 F. Supp. 2d at 19 (allowing claims to proceed against federal agents that issued a detainer and state official that held plaintiff pursuant to the detainer).

As discussed, 8 U.S.C. § 1357(g) outlines the specific ways in which local law enforcement may agree to cooperate with federal authorities in enforcing immigration law. It is undisputed that the NRJPB and the federal government did not have a formal written agreement in place in order to allow for such cooperation. But it is noteworthy here that Officer Bienemann detained Ms. Davila at the request of Agent Tetrault—a federal officer. There is a "catch all" provision in 8 U.S.C. § 1357(g)(10)(B) that allows for local law enforcement to "otherwise" cooperate in the "identification, apprehension, detention, or removal of aliens" without an express agreement. And, 8 U.S.C. § 1357(g)(8) provides that "an officer or employee of a State or a political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under federal or state law." This Court noted, without deciding, in a previous Opinion that "[a] state official conducting an arrest at the sole behest of a federal immigration officer—as Officer Bienemann did at Tetrault's direction in this case— appears to the Court to fall within the ambit of such joint cooperation efforts." *Davila IV*, 247 F. Supp. 3d at 660 n.17. Neither the Supreme Court nor the Third Circuit has delineated the

contours of such joint cooperation efforts. *See Arizona*, 567 U.S. at 410 ("There may be some ambiguity as to what constitutes cooperation[.]"). The Court now joins other courts in concluding that § 1357(g)(10)(B) would not permit a local law enforcement to arrest an individual based solely on an ICE detainer, even if done so at the direction of an ICE agent. *See Creedle*, 2018 WL 6427713 at \*19–\*20; *Ochoa*, 266 F. Supp. 3d at 1254–55; *Lunn*, 78 N.E.3d at 1157–60.

First, the text of § 1357(g)(8) plainly states that the designation of "acting under color of federal authority" is "for purposes of determining the liability, and immunity from suit, *of the officer or employee*[.]" 8 U.S.C. § 1357(g)(8) (emphasis added). Even if Officer Bienemann were acting under color of federal authority (which he was not), this provision does not speak to the potential liability of the NRJPB. The allegation here is that the *custom* of the NRJPB *caused* Officer Bienemann to cooperate with Agent Tetrault's directive and the enforcement of the ICE detainer. The custom is the challenged state action—not Officer Bienemann's personal conduct. Even assuming *arguendo* that Officer Bienemann was acting under color of federal law when he arrested Ms. Davila, the causal nexus is no more attenuated. The indisputable *state* action (the policy of the NRJPB) caused Officer Bienemann to cooperate with ICE and enforce its detainer, leading him to then arrest Ms. Davila pursuant to the detainer. Further, the Court cannot—and does not—conclude that Officer Bienemann's warrantless arrest of Ms. Davila would be sanitized if § 1357(g)(8) applied. The provision states that it applies "for purposes of determining the liability, and immunity from suit." *Id.* This suggests a quite narrow application and says nothing about whether the state officer is actually authorized to perform a warrantless arrest for a civil immigration violation.

Further, it strikes the Court as a perverse reading of § 1357 to suggest that a local law enforcement officer acts under federal authority whenever the local officer responds to an informal request from a federal agent. Otherwise, a state officer would need only to ask permission from an ICE agent to assist with arresting suspected deportable aliens and that local officer would then essentially have all of the powers and immunities of a federal agent enforcing civil immigration laws. If this were true, it would render the thorough training, supervision, and certification requirements in 8 U.S.C. § 1357(g)(2)–(3) completely superfluous. *See Creedle*, 2018 WL 6427713 at \*19 (referencing the "rule against superfluities" as described in *Hibbs v. Winn*, 542 U.S. 88 (2004)). And these requirements are quite exacting for good reason. In addition to lacking a legitimate interest in enforcing civil immigration laws, the local officers choosing to cooperate with federal officials must be adequately trained, directed, and supervised by the federal agencies with expertise in these areas such that the risk of infringement upon constitutional rights is reduced. Indeed, the *Lopez-Aguilar* court recognized that local law enforcement officers can make "constitutionally reasonable seizures for civil immigration violations" "*[o]nly when* . . . directed, supervised, trained, certified, *and* authorized by the federal government." 296 F. Supp. 3d at 977 (emphasis added). At most, Officer Bienemann received "authorization," and possibly "direction," from the federal government to detain Ms. Davila. The Court concludes that even if this were enough for Officer Bienemann's actions to be also attributable to the United States, this is insufficient to clothe him (or the NRJPB) with immunizing federal authority to effect a seizure for solely civil violations of immigration laws.

The practical circumstances of Officer Bienemann's "cooperation" with ICE in this case further belie the suggestion that he was acting with federal authority. Even if this was a species of cooperation between ICE and the NRJPB, it is hard to imagine a more informal or minimal

-78-

arrangement. The Third Circuit has not expressly laid out a formulation as to when a local officer

may be acting under federal law. But, after surveying a number of courts, the Middle District of

North Carolina identified the following factors as relevant:

> Whether the officers (1) participated in a clearly federal
> investigation or in a federally instigated raid; (2) presented local,
> state or federal identification, or were cross-deputized as federal
> agents; (3) received payment from the local, state or federal
> government; (4) had only a de minimis involvement in the actions;
> (5) acted pursuant to federal law; and (6) performed the day-to-day
> operations under the control or supervision of the local, state or
> federal government. None of these factors, in isolation, establishes
> that municipal employees acted under color of state law. In the
> totality of the circumstances, however, these factors inform the
> resolution of the state action question.

*Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 537 (M.D.N.C. 2008) (internal

citations omitted). This case began as a routine stop for a minor traffic violation; it was never a

federal investigation or raid. It appears from the record that Officer Bienemann solely presented

himself as an NRJPB officer and never held himself out to be an agent of the federal

government. At all times relevant to this case, Officer Bienemann remained an employee of—

and subject to the direction of—the NRJPB. And beyond requesting that Officer Bienemann

detain Ms. Davila, ICE provided no supervision or control over Officer Bienemann's actions.

While it is true that Officer Bienemann detained Ms. Davila supposedly pursuant to federal

immigration law, this alone cannot transform him into a solely federal actor. *Davila IV*, 247 F.

Supp. 3d at 661 n.18 (citing *Locke v. United States*, 215 F. Supp. 2d 1033, 1038–39 (D.S.D.

2002)); *see also Lopez-Aguilar*, 296 F. Supp. 3d at 977. It is also true that Agent Tetrault orally

requested that Officer Bienemann assist with detaining Ms. Davila pursuant to the detainer. But a

local law enforcement officer does not become a federal agent (and a federal agent *only*) every

time a federal actor asks the local officer for assistance. To Ms. Davila, Officer Bienemann

would have been at all times Officer Bienemann of the Northern Regional Joint Police Board. As he took her into custody, he "carr[ied] a badge of authority of a State and represent[ed] it in some capacity" and thus could be found to have acted under color of state law. *Monroe*, 365 U.S. at 171–72.

In summary, Ms. Davila has demonstrated beyond dispute that the NRJPB maintained a custom of complying with all ICE immigration detainers without determining whether there was independent probable cause to arrest the individual. Further, based on Chief Amann's deposition admissions as the testimonial speaker for the NRJPB, this was the actual custom of NRJPB policymakers. Finally, there was an unquestionable causal nexus between this custom and Officer Bienemann's actions that led to Ms. Davila's alleged constitutional harms. Accordingly, Ms. Davila's Motion for Summary Judgment as to this claim will be granted as to liability, and that of the NRJPB will be denied.[23]

## IV. CONCLUSION

For the foregoing reasons, Ms. Davila's Motion for Partial Summary Judgment (ECF No. 234) will be GRANTED IN PART and DENIED IN PART. Ms. Davila's Motion will be GRANTED with respect to Count I of the Third Amended Complaint (ECF No. 138) against Officer Bienemann and with respect to Count II against the NRJPB. Summary judgment as to

---

[23] The parties appear to dispute whether the NRJPB moved for summary judgment as to Count II of the Third Amended Complaint (the second unreasonable seizure claim). (Third Amended Compl. ¶¶ 175–79). In its Motion for Summary Judgment, the NRJPB incorrectly asserted that only Count I and Count III of the Third Amended Complaint remain against the NRJPB because the Court had previously dismissed Count II as asserted against Officer Bienemann. (ECF No. 240). The Court never reached the issue as to whether Officer Bienemann's seizure of Ms. Davila based upon the ICE detainer violated Ms. Davila's Fourth Amendment rights and dismissed the claim on the basis of qualified immunity. *Davila III*, 2016 WL 1252986 at *4–*5. Per *Pearson*, the Court was not required to determine whether a deprivation of constitutional rights had occurred because the right at issue was not clearly established. *Williams v. Borough of West Chester*, 891 F.2d 458, 466–67 (3d Cir. 1989) is not to the contrary. There, it was adjudicated that the officers' conduct did not violate the plaintiffs' constitutional rights. Courts may find that a municipality is liable for a constitutional violation even though the officers involved are granted qualified immunity. *E.g.*, *Santos*, 725 F.3d at 468–70. At any rate, the issue of whether NRJPB moved for summary judgment is moot because the undisputed facts in the record demonstrate that Ms. Davila is entitled to summary judgment in her favor, and the NRJPB would not be.

liability will be entered in favor of Ms. Davila and against Officer Bienemann on Count I and in favor of Ms. Davila and against the NRJPB on Count II. The remainder of Ms. Davila's Summary Judgment Motion will be DENIED.

Defendant Officer Bienemann's Motion for Summary Judgment (ECF No. 238) will be GRANTED IN PART and DENIED IN PART. Officer Bienemann's Motion will be GRANTED with respect to Count V of the Third Amended Complaint (ECF No. 138). Count V of the Third Amended Complaint will be DISMISSED with respect to Officer Bienemann. The remainder of Officer Bienemann's Motion will be DENIED.

Defendant NRJPB's Motion for Summary Judgment (ECF No. 240) will be GRANTED IN PART and DENIED IN PART. The NRJPB's Motion shall be GRANTED with respect to Counts I and III of the Third Amended Complaint (ECF No. 138). Counts I and III of the Third Amended Complaint will be DISMISSED with respect to the NRJPB. The remainder of the NRJPB's Motion will be DENIED.

What this all means is that the following claims will proceed to trial: 1) Count I of the Third Amended Complaint (Unreasonable Seizure) against Officer Bienemann, as to damages only; 2) Count II of the Third Amended Complaint (Unreasonable Seizure) against NRJPB, as to damages only, and; 3) Count III of the Third Amended Complaint (Equal Protection) against Officer Bienemann as to liability and damages.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: February 27, 2019
cc: All counsel of record